**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STEPHEN BARTON, DANIEL LEVINE, SANDI MORGAN, TUCKER JAROLL, CLAIRE SCHMITT, ANNA BALTZER, and RANDALL HARTWRIGHT, individually and on behalf of all others similarly situated, | Case No. 2:26-cv-2364 <br><br> **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| COSTCO WHOLESALE CORPORATION, a Washington corporation, | |
| Defendant. | |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

                                                                                              **Page**

I.    NATURE OF THE ACTION .................................................................................. 1

II.   JURISDICTION AND VENUE ............................................................................ 5

III.  PARTIES ............................................................................................................... 6

IV.   FACTUAL ALLEGATIONS ................................................................................ 14

      A.    The Contaminated Products ...................................................................... 14

      B.    Costco Controls and Creates Content for the Contaminated
            Products' Detail Pages .............................................................................. 14

      C.    The Packaging's Overall Impression and Misrepresentations and
            Partial Misrepresentations Contradict the Presence of Heavy
            Metals ........................................................................................................ 17

      D.    The Consumption of Heavy Metals Poses Real Health Risks ................... 19

      E.    Negative Health Effects of Arsenic .......................................................... 20

      F.    Negative Health Effects of Cadmium ........................................................ 22

      G.    Negative Health Effects of Lead .............................................................. 24

      H.    The Contaminated Products Contain Levels of Heavy Metals that
            are Unhealthy and Unsafe at Any Level .................................................. 30

      I.    Defendant Actively Concealed the Truth About the Contaminated
            Products from Consumers .......................................................................... 35

      J.    Protein Powder Products Sold by Costco Can Be Manufactured
            Without Heavy Metals .............................................................................. 37

      K.    The Material Omissions and Misrepresentations Mislead and
            Deceive Reasonable Consumers ................................................................ 39

      L.    Costco's Knowledge and Failure to Disclose .......................................... 45

V.    CLASS ACTION ALLEGATIONS ..................................................................... 47

VI.   CLAIMS FOR RELIEF ....................................................................................... 52

COUNT I VIOLATION OF THE WASHINGTON CONSUMER PROTECTION
      ACT, WASH. REV. CODE ANN. §19.86.010, *ET SEQ.* AGAINST
      DEFENDANT ON BEHALF OF THE CLASS, OR ALTERNATIVELY,
      ON BEHALF OF PLAINTIFF BARTON AND THE WASHINGTON
      SUBCLASS ........................................................................................................ 52

CLASS ACTION COMPLAINT - i

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

COUNT II VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §17200, *ET SEQ.* (ON BEHALF OF PLAINTIFF LEVINE, PLAINTIFF MORGAN AND THE CALIFORNIA SUBCLASS) ................................................................................................55

COUNT III VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE §17500, *ET SEQ.* (ON BEHALF OF PLAINTIFF LEVINE, PLAINTIFF MORGAN AND THE CALIFORNIA SUBCLASS) ................................................................................................58

COUNT IV VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §1750, *ET SEQ.* (ON BEHALF OF PLAINTIFF LEVINE, PLAINTIFF MORGAN, AND THE CALIFORNIA SUBCLASS) ................................................................................59

COUNT V VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT, 815 ILL. COMP. STAT. §505/1, *ET SEQ.* (ON BEHALF OF PLAINTIFF JAROLL AND THE ILLINOIS SUBCLASS) ................................................................................................61

COUNT VI VIOLATIONS OF MINNESOTA'S UNLAWFUL TRADE PRACTICES ACT, MINN. STAT. §325D.13, *ET SEQ.* (ON BEHALF OF PLAINTIFF SCHMITT AND THE MINNESOTA SUBCLASS) ...................................63

COUNT VII VIOLATIONS OF MINNESOTA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. §325D.44, *ET SEQ.* (ON BEHALF OF PLAINTIFF SCHMITT AND THE MINNESOTA SUBCLASS) ................................................................................................65

COUNT VIII VIOLATIONS OF MINNESOTA'S FALSE STATEMENT IN ADVERTISING ACT, MINN. STAT. §325F.67, *ET SEQ.* (ON BEHALF OF PLAINTIFF SCHMITT AND THE MINNESOTA SUBCLASS) ............................67

COUNT IX VIOLATIONS OF MINNESOTA'S PREVENTION OF CONSUMER FRAUD ACT, MINN. STAT. §325F.69, *ET SEQ.* (ON BEHALF OF PLAINTIFF SCHMITT AND THE MINNESOTA SUBCLASS) ................................................................................................70

COUNT X VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT, OHIO REV. CODE ANN. §1345.01, *ET SEQ.* (ON BEHALF OF PLAINTIFF BALTZER AND THE OHIO SUBCLASS) ................................................72

COUNT XI VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, TEX. BUS. & COM. CODE §§17.41, *ET SEQ.* (ON BEHALF OF PLAINTIFF HARTWRIGHT AND THE TEXAS SUBCLASS) ................................................76

COUNT XII FRAUDULENT CONCEALMENT  (BASED ON WASHINGTON LAW) AGAINST DEFENDANT ON BEHALF OF THE CLASS ................................80

CLASS ACTION COMPLAINT - ii

011394-11/5037546 V1

**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

PRAYER FOR RELIEF ................................................................................................82

JURY DEMAND ........................................................................................................83

CLASS ACTION COMPLAINT - iii

011394-11/5037546 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Plaintiffs Stephen Barton, Daniel Levine, Sandi Morgan, Tucker Jaroll, Claire Schmitt, Anna Baltzer, and Randall Hartwright, ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Costco Wholesale Corporation ("Costco" or "Defendant") for violations of the Washington Consumer Protection Act, RCW 19.86.020, the laws of various other states as a subclass and the common law. Plaintiffs allege the following based upon personal knowledge as to allegations regarding themselves, and the investigation of their counsel, and on information and belief as to all other allegations.

## I.    NATURE OF THE ACTION

1.    Costco sells Orgain Organic Protein Powder (the "Contaminated Products") in its stores and online.  Though represented to have "quality ingredients and higher standards", and to provide "good clean fuel", and that Orgain is "relentless about quality," the Contaminated Products' representation is not true and is misleading, as the Contaminated Products are tainted with heavy metals which include lead, cadmium, and arsenic.[1]

2.    Heavy metals are known to pose significant and adverse health risks and consequences to humans. It is well-recognized that there are no safe levels of human exposure to any of the heavy metals, including cadmium and lead.[2] Exposure to heavy metals, including

---

[1] As used herein, the "Contaminated Products" collectively refers to Orgain Organic Protein Powder in Vanilla Bean and Creamy Chocolate Fudge. Discovery may reveal other products by Defendant that contain heavy metals. Plaintiffs reserve their rights to amend and include such additional products and/or heavy metals in this action.

[2] Transcript from Public Meeting, *Closer to Zero Action Plan: Impacts of Toxic Element Exposure and Nutrition at Different Crucial Developmental Stages for Babies and Young Children*, (Nov. 18, 2021), https://www.fda.gov/media/155396/download at 32, 72, 179 (last accessed June 25, 2026) ("Closer to Zero Public Meeting Transcript"); *FDA Webinar: Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance*, at 5 (March 2, 2023), https://www.fda.gov/media/166188/download (last accessed June 25, 2026) ("Although we may not be able to say the reference level is a safe level, it is a level we could rely on as a benchmark to measure exposure to foods."); *see also* Kevin Loria, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, Consumer Reports (Sept. 29, 2021, updated Oct. 20, 2021), https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9CThere%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed June 25, 2026) ("Consumer Reports: Heavy Metals in Baby Food"); *see*, *e.g.*, World Health Organization, *Lead Poisoning*, June 10, 2026,

CLASS ACTION COMPLAINT - 1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

cadmium and lead, can cause negative health effects, such as various cancers, gastric and vascular disorders, liver, kidney, and brain damage, miscarriages, and reproductive disorders:[3]

3.      Critically, the scientific consensus is that there are no known safe levels of heavy metals: "***On the contrary, for the [heavy metals] we are discussing today, we have not identified safe levels of exposure for developmental outcomes***."[4] Heavy metals accumulate over time resulting in latent health effects that cannot be mitigated and may appear years later.[5] Further,

https://who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (last accessed June 25, 2026) ("WHO Lead Poisoning").

[3] Anirban Goutam Mukherjee, et al., *Heavy Metal and Metalloid Contamination in Food and Emerging Technologies for Its Detection*, Sustainability, Jan. 9, 2023, 15(2), https://www.mdpi.com/2071-1050/15/2/1195 (last accessed June 25, 2026).

[4] Conrad Choiniere, Center for Food Safety and Applied Nutrition, Closer to Zero Public Meeting Transcript, *supra*, at 32 ) (emphasis added).

[5] *See, e.g.*, Agency for Toxic Substances and Disease Registry ("ATSDR"), *What is the Biological Fate of Lead in the Body?*, May, 24, 2023, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/leadtoxicity/biologic_fate.html ("The body accumulates lead over a lifetime and normally releases it very slowly.") (last accessed June 25,

CLASS ACTION COMPLAINT - 2

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

because heavy metals accumulate in the body over time, even very low-level exposure on a regular basis can be hazardous. This is why the presence of heavy metals is material to reasonable consumers and must be disclosed.

4.    The inclusion or material risk of elevated levels of arsenic, cadmium, and lead also contradict and impede the central function of the Contaminated Products, which are intended to as a supplement to boost nutrition. Arsenic, cadmium, and lead provide no such benefits and, instead, pose health risks.

5.    Costco controls the content of product listings that describe the Contaminated Products to consumers. It also conveys the Contaminated Products to consumers, by selling the Contaminated Products directly to consumers through its warehouses and website.

6.    Costco sells the Contaminated Products at Costco stores and on Costco.com and markets the Contaminated Products as high quality, clean, and nutritious without disclosing the presence or risk of heavy metals, including lead, cadmium, and arsenic.

7.    Defendant fails to disclose the Contaminated Products contain heavy metals. Nowhere at Costco's point-of-sale (webpages or in its retail stores)[6] does it disclose to consumers that the Contaminated Products contain heavy metals, including lead, cadmium, and arsenic (collectively, the "Omissions").

8.    The packaging and the point-of-sale for the Contaminated Products contain misrepresentations and partial misstatements that contradict the presence of heavy metals such as lead, cadmium, and arsenic (collectively, the "Misrepresentations").

9.    Defendant knew or, at a minimum, should have known, that the Contaminated Products it sells contained detectable levels of heavy metals, including lead, cadmium, and arsenic,

---

2026); Sustainability Directory, "What are Long-Term Effects of Heavy Metal Exposure?" November 22, 2025, https://pollution.sustainability-directory.com/question/what-are-long-term-effects-of-heavy-metal-exposure/ ("Bioaccumulation is the key, meaning they build up faster than they can be removed, concentrating in tissues and organs. This buildup is not just a minor inconvenience; it disrupts cellular function, which affects normal body processes.") (last accessed June 25, 2026).

[6] As used herein, "point-of-sale" refers to Defendant's webpages and retail stores.

CLASS ACTION COMPLAINT - 3

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

but chose to remain silent and sold the Contaminated Products anyway in its stores and online, in violation of its statutory duties.

10.    Based on the messaging and overall impression communicated by Defendant's point-of-sale, including the material Misrepresentations and Omissions, no reasonable consumer purchasing protein powder products would expect the Contaminated Products to contain heavy metals, especially since the Contaminated Products are marketed as high quality, clean, and nutritious, and intended to be ingested. Furthermore, reasonable consumers, like Plaintiffs, would consider the inclusion of heavy metals like lead, cadmium, or arsenic a material fact when considering what protein powder products to purchase.

11.    Reasonable consumers, like Plaintiffs, could not learn of the inclusion of heavy metals in the Contaminated Products unless Costco included a proper disclosure, because identifying the presence of heavy metals requires expensive and sophisticated laboratory testing. But Costco failed to perform or require any heavy metal testing, or to disclose the presence of heavy metals.

12.    Reporting by the Clean Label Project and Consumer Reports showed detectable levels of heavy metals in protein powder products, including the Contaminated Products. The Clean Label Project found 79% of organic protein powders tested over California's Proposition 65's level for lead, with 41% testing more than two times the Proposition 65 level.[7] Consumer Reports tested Orgain Organic Plant-Based Protein Powder Vanilla Bean and found it exceeded its "level of concern" for lead.[8]

13.    Independent laboratory testing conducted by Plaintiff Hartwright and Plaintiffs' counsel confirmed the presence of heavy metals in the Contaminated Products.

| Product | Lead | Cadmium | Arsenic |
|---|---|---|---|
| Orgain Organic Protein Powder in Vanilla Bean | 3.37 µg/serving 67 ppb | 1.19 µg/serving 24 ppb | 0.735 µg/serving 15 ppb |

---

[7] https://cleanlabelproject.org/protein-study/ (last accessed June 25, 2026).

[8] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed June 14, 2026).

CLASS ACTION COMPLAINT - 4

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

011394-11/5037546 V1

| Product | Lead | Cadmium | Arsenic |
|---|---|---|---|
| Orgain Organic Protein Powder in Vanilla Bean | 0.823 µg/serving 16 ppb | 1.15 µg/serving 23 ppb | 0.577 µg/serving 12 ppb |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 1.70 µg/serving 34 ppb | 3.45 µg/serving 69 ppb | 0.874 µg/serving 17 ppb |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 2.30 µg/serving 46 ppb | 2.75 µg/serving 55 ppb | 0.920 µg/serving 18 ppb |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 1.03 µg/serving 20.5 ppb | 3.52 µg/serving 70.3 ppb | 0.710 µg/serving 14.2 ppb |

14.     Accordingly, reasonable consumers must and do rely on Defendant to honestly and completely report what the Contaminated Products contain.

15.     Defendant intended for consumers to rely on the overall impression, Misrepresentations, Omissions, and other deceptive conduct of the advertising and packaging in purchasing the Contaminated Products at a premium. Defendant's business practices—including the Misrepresentations and Omissions—were deceptive, misleading, unfair, and/or false because, among other things, the Contaminated Products contained undisclosed toxic heavy metals.

16.     Defendant knows its customers trust the quality of the Contaminated Products it markets and sells and expect the Contaminated Products to conform to the packaging and advertising and be nutritious, healthy, and high quality with no risk of containing detectable levels of heavy metals.

17.     Defendant also knows consumers will pay more (*i.e*., a premium) for products that they are led to believe are free from harmful contaminants such as heavy metals.

18.     By engaging in the conduct alleged in this complaint, Defendant has violated Washington state law.

## II.    JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act ("CAFA"), because: (a) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (b) minimal diversity exists because at least one member of the proposed class is a citizen of a state different from the Defendant; and (c) the proposed class consists of more than 100 members.

CLASS ACTION COMPLAINT - 5

011394-11/5037546 V1

20. Plaintiffs have Article III standing to bring this action. Plaintiffs suffered a concrete and particularized injury-in-fact: they paid money for the Contaminated Products that they would not have purchased, or would have paid less for, had Costco disclosed the presence of heavy metals. Plaintiffs' injuries are fairly traceable to Costco's deceptive conduct because, absent the Misrepresentations and Omissions, Plaintiffs would not have purchased the Contaminated Products or would have purchased lower-priced alternatives with non-detectable levels of heavy metals. Plaintiffs' injuries are redressable by a favorable judicial decision awarding damages and injunctive relief.

21. This Court has personal jurisdiction over Defendant Costco Wholesale Corporation because Costco is a Washington corporation with its principal place of business and corporate headquarters located at 999 Lake Drive, Issaquah, Washington 98027, within this judicial District. Costco is incorporated under the laws of the State of Washington and conducts substantial business within this District.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, and a substantial part of the events or Misrepresentations or Omissions giving rise to Plaintiffs' claims occurred in this District, including Costco's corporate decision-making regarding product sourcing, labeling, and disclosure.

23. Pursuant to RCW 19.86.095, the Washington Attorney General shall be served with a copy of this Complaint contemporaneously with or shortly after its filing.

## III.   PARTIES

24. Plaintiff Stephen Barton ("Plaintiff Barton") is, and at all relevant times was, a resident and citizen of the State of Washington. During the Class Period, Plaintiff Barton purchased Orgain Organic Protein Powder (Creamy Chocolate Fudge and Vanilla Bean flavors) from the Costco warehouse located in Renton, Washington. Plaintiff Barton paid approximately $31 per container for the Contaminated Products, purchasing approximately 12-18 containers between February 2025 and June 2026. At the time of each purchase, Plaintiff Barton reviewed the product packaging and Costco's website, which prominently displayed claims such as "good,

CLASS ACTION COMPLAINT - 6

011394-11/5037546 V1

**HAGENS BERMAN**

clean nutrition," "cleaner ingredients," and "higher standards," and relied on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

25.     Prior to purchasing, Plaintiff Barton saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Barton's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Barton was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Barton was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Barton expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Barton known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Barton would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Barton would, however, purchase the Contaminated Products again in the future, if he could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

26.     Plaintiff Daniel Levine ("Plaintiff Levine") is, and at all relevant times was, a resident and citizen of the State of California. During the Class Period, Plaintiff Levine purchased Orgain Organic Protein Powder (Creamy Chocolate Fudge flavor) from the Costco warehouse located in Tustin, California. Plaintiff Levine paid approximately $30 per container for the Contaminated Products, purchasing approximately six containers between June 1, 2025 and June 10, 2026. At the time of each purchase, Plaintiff Levine reviewed the product packaging and Costco's website, which prominently displayed claims such as "good, clean nutrition," "cleaner

CLASS ACTION COMPLAINT - 7

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

ingredients," and "higher standards," and relied on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

27. Prior to purchasing, Plaintiff Levine saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Levine's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Levine was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Levine was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Levine expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Levine known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Levine would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Levine would, however, purchase the Contaminated Products again in the future, if he could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

28. Plaintiff Sandi Morgan ("Plaintiff Morgan") is, and at all relevant times was, a resident and citizen of the State of California. During the Class Period, Plaintiff Baltzer purchased Orgain Organic Protein Powder (Creamy Chocolate Fudge flavor) online from Costco and from Costco warehouse locations San Marcos, California and Vista, California. Plaintiff Morgan paid approximately $26.99 to $36.99 per container for the Contaminated Products, purchasing approximately 120 containers between 2019 and April 2025. At the time of each purchase, Plaintiff Morgan reviewed the product packaging and Costco's website, which prominently displayed claims such as "good, clean nutrition," "cleaner ingredients," and "higher standards," and relied

CLASS ACTION COMPLAINT - 8

011394-11/5037546 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

29.    Prior to purchasing, Plaintiff Morgan saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Baltzer's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Morgan was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Morgan was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Morgan expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Morgan known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Morgan would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Morgan would, however, purchase the Contaminated Products again in the future, if she could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

30.    Plaintiff Tucker Jaroll ("Plaintiff Jaroll") is, and at all relevant times was, a resident and citizen of the State of Illinois. During the Class Period, Plaintiff Jaroll purchased Orgain Organic Protein Powder (Creamy Chocolate Fudge flavor) from the Costco warehouse located in Chicago, Illinois. Plaintiff Jaroll paid $33.99 per container for the Contaminated Products, purchasing one container on April 1, 2025. At the time of each purchase, Plaintiff Jaroll reviewed the product packaging and Costco's website, which prominently displayed claims such as "good, clean nutrition," "cleaner ingredients," and "higher standards," and relied on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

CLASS ACTION COMPLAINT - 9

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

31. Prior to purchasing, Plaintiff Jaroll saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Jaroll's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Jaroll was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Jaroll was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Jaroll expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Jaroll known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Jaroll would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Jaroll would, however, purchase the Contaminated Products again in the future, if he could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

32. Plaintiff Claire Schmitt ("Plaintiff Schmitt") is, and at all relevant times was, a resident and citizen of the State of Minnesota. During the Class Period, Plaintiff Schmitt purchased Orgain Organic Protein Powder (Vanilla Bean and Creamy Chocolate Fudge flavors) from Costco warehouse locations Maplewood, Minnesota and Maple Grove, Minnesota. Plaintiff Schmitt paid $33.99 per container for the Contaminated Products, purchasing approximately six containers between August 2025 and April 2026. At the time of each purchase, Plaintiff Schmitt reviewed the product packaging and Costco's website, which prominently displayed claims such as "good, clean nutrition," "cleaner ingredients," and "higher standards," and relied on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

CLASS ACTION COMPLAINT - 10

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

33. Prior to purchasing, Plaintiff Schmitt saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Schmitt's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Schmitt was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Schmitt was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Schmitt expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Schmitt known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Schmitt would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Schmitt would, however, purchase the Contaminated Products again in the future, if she could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

34. Plaintiff Anna Baltzer ("Plaintiff Baltzer") is, and at all relevant times was, a resident and citizen of the State of Ohio. During the Class Period, Plaintiff Baltzer purchased Orgain Organic Protein Powder (Vanilla Bean flavor) from the Costco warehouse located in Perrysburg, Ohio. Plaintiff Baltzer paid approximately $35 per container for the Contaminated Products, purchasing approximately 2 containers between 2022 and 2025. At the time of each purchase, Plaintiff Baltzer reviewed the product packaging and Costco's website, which prominently displayed claims such as "good, clean nutrition," "cleaner ingredients," and "higher standards," and relied on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

CLASS ACTION COMPLAINT - 11

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

35. Prior to purchasing, Plaintiff Baltzer saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Baltzer's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Baltzer was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Baltzer was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Baltzer expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Baltzer known the Contaminated Products contained cadmium at levels as high as 70.3 ppb, Plaintiff Baltzer would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Baltzer would, however, purchase the Contaminated Products again in the future, if she could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

36. Plaintiff Randall Hartwright ("Plaintiff Hartwright") is, and at all relevant times was, a resident and citizen of the State of Texas. During the Class Period, Plaintiff Hartwright purchased Orgain Organic Protein Powder - Vanilla Bean, Creamy Chocolate Fudge, Strawberries & Cream, and Pumpkin Spice - from Costco warehouse locations in the State of Texas, including Dallas, Frisco, East Plano, West Plano, Allen, Duncanville, Fort Worth, and possibly Arlington. Plaintiff Hartwright paid approximately $30 to $39 per container for the Contaminated Products, purchasing approximately 30 to 40 containers between 2022 and 2025. At the time of each purchase, Plaintiff Hartwright reviewed the product packaging, which prominently displayed claims such as "good, clean nutrition," "cleaner ingredients," and "higher standards," and relied

CLASS ACTION COMPLAINT - 12

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

on those representations in deciding to purchase the Contaminated Products over lower-priced alternatives.

37. Prior to purchasing, Plaintiff Hartwright saw and relied upon the packaging of the Contaminated Products and representations on Defendant's website, including the claims that the Contaminated Products provide "good, clean nutrition," contain "cleaner ingredients," are held to "higher standards," and deliver "the power of clean." These specific representations were material to Plaintiff Hartwright's purchasing decision because they conveyed that the Contaminated Products were pure, safe, and free from harmful contaminants. During the time Plaintiff Hartwright was purchasing and consuming the Contaminated Products, and as a result of the Misrepresentations and Omissions as detailed herein, Plaintiff Hartwright was unaware the Contaminated Products contained or had a material risk of containing heavy metals. Plaintiff Hartwright expected the Contaminated Products to be safe and free from detectable levels of undisclosed heavy metals, and would not have purchased the Contaminated Products or would have paid significantly less for them if that information had been fully disclosed. Had Plaintiff Hartwright known the Contaminated Products contained lead at levels exceeding California's Proposition 65 safe harbor by more than 600%, Plaintiff Hartwright would have purchased one of the many available competitor protein powder products that contain non-detectable levels of heavy metals at comparable or lower prices. Plaintiff Hartwright would, however, purchase the Contaminated Products again in the future, if he could be certain the Contaminated Products do not contain or have a material risk of containing harmful heavy metals.

38. Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23(b)(3).

39. Defendant Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal offices at 999 Lake Drive, Issaquah, Washington 98027. Costco operates approximately 600 warehouse locations in the United States and sells Orgain Organic Protein Powder as a regular inventory item in its stores and online at Costco.com.

CLASS ACTION COMPLAINT - 13

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

40. At all relevant times, Costco was engaged in the trade and commerce of selling consumer goods, including dietary supplements and protein powder products, to the general public in Washington and nationwide. Costco marketed and sold the Contaminated Products to consumers, including Plaintiffs and Class Members, through its retail warehouse locations and its website.

## IV. FACTUAL ALLEGATIONS

**A. The Contaminated Products**

41. The Contaminated Products are plant-based protein supplements sold through Costco warehouse stores and Costco.com.

42. Plaintiffs and the Class Members were exposed to the Misrepresentations and Omissions on the packaging and on Defendant's point-of-sale for the Contaminated Products.

43. The Contaminated Products' packaging does not contain any disclosure or warning regarding the presence of lead, cadmium, arsenic, or other heavy metals. The packaging prominently features the "USDA Organic" certification mark, which a reasonable consumer would associate with purity and the absence of harmful contaminants.

**B. Costco Controls and Creates Content for the Contaminated Products' Detail Pages**

44. Costco controls the content for the point-of-sale for products sold to consumers on its website.

45. Each of the Contaminated Products is sold on Costco's website via a product page. The page for each product includes a product description and pictures of the product packaging and ingredient panel.

46. Defendant does not require the manufacturer of the Contaminated Products to test its products for heavy metals or to include the results of such tests on the product pages.

47. For example, the product page for Orgain Organic Protein in Vanilla Bean is set forth below:

CLASS ACTION COMPLAINT - 14



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



48.    The product page contains language touting the product's "power of clean," "quality ingredients [and] higher standards," provides "good clean fuel," and that it is "relentless about quality." Nowhere does it disclose that the product contains heavy metals, including lead, cadmium, and arsenic.



CLASS ACTION COMPLAINT - 15

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

49. The product page also includes the statement, "delivering clean nutrition," along with icons touting it as, *e.g.*, "certified organic," "certified plant based," containing "50 organic superfoods," and "non-GMO."



50. Additionally, the product page identifies the manufacturer's mission: "to help more people live vibrant lives through the power of good, clean nutrition":

> Our mission is to help more people live vibrant lives through the power of good, clean nutrition.

51. The product page also includes a video of the Contaminated Products' manufacturer's founder, Andrew Abraham, where the last message states, "Orgain: Clean Nutrition":



52. The content of the product pages for the Contaminated Products show that Defendant knows the benefits and ingredients of a protein powder are material to consumers and that it fails to disclose to consumers the fact that the Contaminated Products contain heavy metals.

CLASS ACTION COMPLAINT - 16

**C.    The Packaging's Overall Impression and Misrepresentations and Partial Misrepresentations Contradict the Presence of Heavy Metals**

53.    The Contaminated Products' packaging states the Contaminated Products are "good, clean nutrition," has "cleaner ingredients," it is subject to "higher standards," and is "perfect when you wanna shake things up, bake things up, or just have some good, clean fun."



54.    The packaging also highlights Orgain's commitment to "clean nutrition" and its mission "to help people live vibrant lives through good, clean nutrition."

CLASS ACTION COMPLAINT - 17

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

⇒Our Commitment To⇐
## CLEAN NUTRITION

Orgain's relentless pursuit of better nutrition that doesn't compromise on taste is based on my belief that *real foods* can make a real difference. That passion fuels our mission to help people live vibrant lives through *good, clean nutrition.*

55. The packaging makes no disclosure whatsoever regarding the presence of any heavy metals in the Contaminated Products. To the contrary, the Contaminated Products' packaging misleadingly and deceptively conveys to reasonable consumers that the Contaminated Products are high quality, clean, and nutritious, and not contaminated with heavy metals.

56. Defendant knows reasonable consumers expect the Contaminated Products to be healthy and not have detectable levels of harmful heavy metals, including lead, cadmium, and arsenic. The representations above reinforce these reasonable expectations.

57. When reasonable consumers view the packaging's overall impression, Misrepresentations and Omissions, they would have no reason to suspect that the Contaminated Products contain or risk containing heavy metals. Foods that contain high levels of heavy metals are neither nutritious nor healthy.

58. Consumers like Plaintiffs and Class Members rely heavily on Defendant to supply clean, nutritious Products and to provide accurate and complete information about the contents of the Contaminated Products it sells.

59. Defendant had a duty to ensure the Contaminated Products were not deceptively, misleadingly, unfairly, or falsely marketed and that all material information was properly and fully disclosed, which it failed to do, including by its failure to sufficiently or adequately monitor or test for (or require the Contaminated Products' manufacturer to sufficiently or adequately monitor or test for) and disclose the presence (or material risk) of heavy metals in the Contaminated Products.

CLASS ACTION COMPLAINT - 18

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

60.     As detailed below, the inclusion or material risk of elevated levels of lead, cadmium, and arsenic contradict and impede the central function of the Contaminated Products. Lead, cadmium, and arsenic provide no such benefits and instead pose health risks.

**D.      The Consumption of Heavy Metals Poses Real Health Risks**

61.     Heavy metals are neurotoxins, *i.e.*, poisons that affect the nervous system.[9]

62.     Exposure to heavy metals, even in small amounts, can lead to life-long effects. Heavy metals can remain in the human body for years and, as a result, can accumulate in the body, such as in the kidneys and other internal organs, increasing their risk to a person over time.[10]

63.     Because heavy metals bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[11]

64.     Exposure to heavy metals has also been shown to have long-lasting effects on cardiovascular toxicity, hypertension, arrhythmia, atherosclerosis,[12] as well as gastrointestinal and kidney dysfunction, nervous system disorders, skin lesions, vascular damage, immune system dysfunction, birth defects, and cancer.[13]

---

[9] *See, e.g.*, U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, at 2, Feb. 4, 2021, https://oversightdemocrats.house.gov/imo/media/doc/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed June 25, 2026) ("Congressional Committee Report") ("The Food and Drug Administration and the World Health Organization have declared them dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.").

[10] Consumer Reports: Heavy Metals in Baby Foods, *supra*.

[11] *Id*.

[12] Pan Ziwei, Gong Tingyu, and Ping Liang, *Heavy Metal Exposure and Cardiovascular Disease*, Circulation Research, Apr. 26, 2024, https://www.ahajournals.org/doi/epub/10.1161/CIRCRESAHA.123.323617 (last accessed June 25, 2026).

[13] Mahdi Balali-Mood, Kobra Naseri, Zoya Tahergorabi, Mohammad Reza Khazdair, Mahmood Sadeghi, *Toxic Mechanisms of Five Heavy Metals: Mercury, Lead, Chromium, Cadmium, and Arsenic*, Frontiers in Pharmacology, Apr. 12, 2021, https://www.frontiersin.org/journals/pharmacology/articles/10.3389/fphar.2021.643972/full (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 19

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

65. Government agencies and other experts acknowledge and agree that there are no known safe levels of heavy metals. As examples:

- Conrad Choiniere, Director of the Office of Analytics and Outreach in the U.S. Food and Drug Administration's ("FDA") Center for Food Safety and Applied Nutrition: "However overall exposure adds up because many of the foods we eat contain these contaminants in small amounts. This is not to say that we should not be concerned. On the contrary, for the contaminants we are discussing today, we have not identified safe levels of exposure for developmental outcomes."[14]

- Dr. Aparna Bole, pediatrician speaking on behalf of the American Academy of Pediatrics ("AAP"): "There is no known safe level of exposure to these metals for children. Exposure to toxic elements has a disproportionate effect on infants and toddlers because their brains are rapidly developing, especially during their first 1,000 days."

- Dr. Karagas, Professor and Chair of the Department of Epidemiology at the Geisel School of Medicine at Dartmouth College: "Arsenic, cadmium, mercury and lead, shown here, circled in these red circles, they do not have any known physiologic essential function in the body and there is no known safe level to our knowledge."[15]

## E.   Negative Health Effects of Arsenic

66. There is no health benefit to the inclusion of arsenic in food products.

67. Arsenic is toxic to humans, classified as a carcinogen, and is one of the World Health Organization's ("WHO") "10 chemicals of major public concern."[16]

68. Arsenic can cause cancer, as well as diabetes, atherosclerosis, and potentially cardiovascular disease when ingested chronically.[17]

---

[14] Closer to Zero Public Meeting Transcript, *supra*, at 32.

[15] *Id.* at 72.

[16] World Health Organization, *Arsenic* (Dec. 7, 2022), https://www.who.int/news-room/fact-sheets/detail/arsenic (last accessed June 25, 2026) ("WHO: Arsenic").

[17] J. Christopher States, et al., *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis,* PLOS ONE (June 15, 2012), 7(6): e38713, https://doi.org/10.1371/journal.pone.0038713 (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 20

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

69. Arsenic can affect multiple organs and systems, including the endocrine, immune, nervous, and respiratory system; liver, kidney, and bladder; prostate glands; and skin.[18]

70. Chronic or long-term exposure to arsenic can cause skin disease and is also associated with skin, bladder, and lung cancer, as well as adverse pregnancy outcomes, infant mortality, diabetes, and cardiovascular disease.[19]

71. Even low-level exposure to arsenic can result in severe long-term health effects and increase the risk of other types of chronic disease.[20] Long-term exposure to lower levels of arsenic can also cause a shortage of red and white blood cells, which can lead to fatigue and an increased risk of infections.[21]

72. Further, "[t]here is no evidence that the harm caused by arsenic is reversible."[22]

73. Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[23]

---

[18] National Institute of Environmental Health Sciences, *Arsenic and Your Health*, at 3, http://www.niehs.nih.gov/sites/default/files/health/materials/arsenic_and_your_health_508.pdf (last accessed Jan. 15, 2026) ("Arsenic and Your Health").

[19] WHO: Arsenic, *supra*; Stephen J. Genuis, et al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE (Nov. 21, 2012), 7(11): e49676, https://doi.org/10.1371/journal.pone.0049676 (last accessed June 25, 2026) ("Toxic Element Contamination of Natural Health Products") (chronic exposure to arsenic has also been associated with dermatological lesions and malignancies).

[20]Arsenic and Your Health, *supra*, at 3.

[21] American Cancer Society, *Arsenic and Cancer Risk*, https://www.cancer.org/cancer/risk-prevention/chemicals/arsenic.html (last accessed June 25, 2026).

[22] Healthy Babies Bright Futures, *What's in My Baby's Food?* at 13, Oct. 2019, https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf (last accessed June 25, 2026).

[23] *See* Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed June 25, 2026); *see also* 21 C.F.R. § 165.110(b)(4)(iii)(A) (1995).

CLASS ACTION COMPLAINT - 21

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**F.    Negative Health Effects of Cadmium**

74.    There is no known safe level of exposure to cadmium,[24] and cadmium has no known beneficial function in the human body.[25]

75.    The U.S. Department of Health and Human Services ("HHS") and the International Agency for Research on Cancer ("IARC") have determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined that cadmium is a probable human carcinogen.[26]

76.    Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequester[s] in [human] tissue."[27]

77.    Cadmium exposure may be associated with prostrate, bladder, pancreatic, kidney, and breast cancers; the development of diseases related to the central nervous system including Alzheimer's, Parkinsonism and Parkinson's disease, Huntington's disease, amyotrophic lateral sclerosis, multiple sclerosis, and osteoporosis.[28]

78.    Cadmium is also suspected to be mutagenic, meaning it can cause genetic mutation and can inhibit DNA repair and induce DNA strand breaks and chromosomal aberrations.[29]

---

[24] *See* Closer to Zero Public Meeting, *supra*, at 72.

[25] ATSDR, "What Is the Biological Fate of Cadmium in the Body?," Last Reviewed: May 23, 2023, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/Biological-Fate.html (last visited June 25, 2026).

[26] *See* Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed June 25, 2026) ("Public Health Statement for Cadmium").

[27] Toxic Element Contamination of Natural Health Products, *supra*.

[28] Charkiewicz A.E., et al., *Cadmium Toxicity and Health Effects- A Brief Summary*. Molecules, Sept. 14, 2023; 28(18):6620; doi: 10.3390/molecules28186620; PMID: 37764397; PMCID: PMC10537762. https://pmc.ncbi.nlm.nih.gov/articles/PMC10537762/ (last accessed June 25, 2026) ("Cadmium Toxicity and Health Effects").

[29] *See, e.g.*, Cadmium is a mutagen that acts by inhibiting mismatch repair, National Library of Medicine, available at:
https://pmc.ncbi.nlm.nih.gov/articles/PMC2662193/#:~:text=Cadmium%20is%20a%20mutagen%20that%20acts%20by%20inhibiting%20mismatch%20repair (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 22

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

79.    Chronic exposure to even lower levels of cadmium can damage the kidneys, liver, and other parts of the body, and cause bones to become fragile and easily break.[30] Long-term exposure to low levels of cadmium can also cause various diseases, such as cancer, leukemia, and genetic toxicity.[31]

80.    Cadmium is particularly harmful to children and exposure in childhood is associated with decreases in cognitive ability, as well as the development of attention deficit hyperactivity disorder ("ADHD").  A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.

81.    Cadmium appears to affect cognitive development of children, particularly of boys, with studies showing that boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure.

82.    Cadmium can also cross the placenta and the barrier to a fetus, resulting in teratogenic effects.[32]  Human and animal epidemiological studies have shown cadmium exposure in pregnancy to be associated with significant reduction in birthweight and increased occurrence of stillbirth.[33]

83.    Like lead, cadmium accumulates in the body with a long half-life of 6 to 38 years in the kidneys and 4 to 19 years in the liver.[34]

---

[30] Public Health Statement for Cadmium, *supra*; *see also* FDA, *Cadmium in Food and Foodwares*, https://www.fda.gov/food/environmental-contaminants-food/cadmium-food-and-foodwares (last accessed June 25, 2026).

[31] Cadmium Toxicity and Health Effects.

[32] Cadmium Toxicity and Health Effects.

[33] California Environmental Protection Agency, *Evidence on Developmental and Reproductive Toxicity of Cadmium*, Oct. 1996, https://oehha.ca.gov/sites/default/files/media/downloads/proposition-65/chemicals/cd-hid.pdf (last accessed June 25, 2026).

[34] ATSDR, *What Is the Biological Fate of Cadmium in the Body?*, *supra*.

CLASS ACTION COMPLAINT - 23

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

84.    The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb (*see* 40 C.F.R. §141.62(b) (2004)); the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[35]

**G.    Negative Health Effects of Lead**

85.    Lead is a highly toxic heavy metal, used in the production of batteries, ammunition, and metal products such as solder and pipes.[36]

86.    Lead is highly toxic to humans and has been identified as a carcinogen. The harmful effects of lead cannot be reversed or remediated due to its accumulation in the body over time.[37]

87.    There is no health benefit to the inclusion of lead in food products.

88.    Lead is an element, which means it does not break down.

89.    Lead is universally identified as a probable human carcinogen by health agencies in the United States and worldwide. For example:

- HHS determined that lead was "reasonably anticipated to be a human carcinogen."

- The EPA classifies lead as a "probable human carcinogen."

- The IARC classifies lead as "probably carcinogenic to humans."

90.    Lead is number one on the Agency for Toxic Substances and Disease Registry's ("ASTDR") list of substances present in the environment that pose the most significant potential threat to human health[38] and the WHO identifies lead as one of ten chemicals of major public health concern requiring action.[39]

---

[35] *See* Congressional Committee Report, *supra*, at 29.

[36] ATSDR, *ToxFAQs for Lead*, Aug. 7, 2020, https://www.atsdr.cdc.gov/toxfaqs/tfacts13.pdf (last accessed June 25, 2026) ("ATSDR ToxFAQs for Lead").

[37] *See* Congressional Committee Report, *supra*, at 11.

[38] ATSDR, *Substance Priority List*, April 13, 2026, https://www.atsdr.cdc.gov/programs/substance-priority-list.html (last accessed June 25, 2026).

[39] WHO: Lead Poisoning, *supra*.

CLASS ACTION COMPLAINT - 24

011394-11/5037546 V1

**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

91.     Once lead enters the body, it is distributed to organs, including the brain, kidneys, and liver, and it accumulates and is stored in teeth and bones.[40]

92.     Because lead accumulates in the body, even very low-level exposure can be hazardous over time. Lead is a cumulative toxin in bones and soft tissues, where it continues to disrupt critical biological functions long after exposure. The risk intensifies with repeated or prolonged exposure. As the Mayo Clinic warns, "Signs and symptoms usually don't appear until the amount of lead detected in the blood has climbed to a dangerous level."[41] The CDC also states, "The effects of lead poisoning can be permanent and disabling."[42]

93.     Because exposure to lead builds up in the human body over time, it can disrupt neurological, skeletal, reproductive, hematopoietic, renal, and cardiovascular systems.[43]

94.     Even "[r]epeated low-level exposure [to lead] over a prolonged period" can result in clinical symptoms including "[p]ersistent vomiting, encephalopathy, lethargy, delirium and coma[.]"[44]

95.     No amount of lead is safe for human consumption or exposure.[45]

---

[40] *Id.*

[41] Mayo Clinic, *Lead Poisoning*, Dec. 24, 2025, https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (last accessed June 25, 2026).

[42] CDC, *About Childhood Lead Poisoning Prevention*, Aug. 21, 2025, https://www.cdc.gov/lead-prevention/about/index.html (last accessed June 25, 2026).

[43] Collin, M. Samuel, et al., *Bioaccumulation of Lead (Pb) and Its Effects on Human: A Review*, Journal of Hazardous Material Advances, Aug. 2022, (7), doi: https://doi.org/10.1016/j.hazadv.2022.100094 (last accessed June 25, 2026).

[44] Taanvi Bhasin, et al., *Unveiling the Health Ramifications of Lead Poisoning: A Narrative Review*, Cureus, Oct. 9, 2023, 15(10), doi: 10.7759/cureus.46727; https://www.cureus.com/articles/184381-unveiling-the-health-ramifications-of-lead-poisoning-a-narrative-review#!/ (last accessed June 25, 2026).

[45] *See, e.g.*, FDA, *Lead in Food and Foodwares*, Content current as of Jan. 6, 2025 https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (last accessed June 15, 2026) ("Because there is no known safe level of exposure to lead, the FDA monitors and regulates levels of lead in foods."); WHO: Lead poisoning, *supra* ("There is no level of exposure to lead that is known to be without harmful effects."); CDC, *Childhood Lead Poisoning Prevention: CDC Updates Blood Lead Reference Value*, Apr. 2, 2024, https://www.cdc.gov/lead-prevention/php/news-features/updates-blood-lead-reference-value.html (last accessed June 25, 2026); AAP, *Lead Exposure in Children*, last updated May 12, 2025, https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-

CLASS ACTION COMPLAINT - 25

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

96.     Nearly 50 years ago in 1978, the U.S. banned lead-based paint use in residential homes because of concerns over exposure risks to lead.[46] The use of lead as an additive to automobile gasoline was also banned in the United States.[47] This is notable given that paint and gasoline—unlike the Contaminated Products—are not intended to be consumed and put directly into the body or bloodstream.

97.     Lead can cause health problems in almost every organ and system in your body.[48] As examples, exposure to lead can cause damage to the kidneys, anemia (low iron in the blood), and increases in blood pressure. Long-term exposure to lead can also result in neuropathy and brain damage, along with cognitive deficits, such as decreased learning, memory, and attention.

children/#:~:text=How%20Much%20Lead%20is%20Safe,Prevention%20recommends%20evaluation%20and%20intervention (last accessed June 25, 2026); *see also* Consumer Reports: Heavy Metals in Baby Food, *supra*.

[46] CDC, *Childhood Lead Poisoning Prevention: About Lead in Paint*, March 26, 2025, https://www.cdc.gov/lead-prevention/prevention/paint.html (last accessed June 25, 2026).

[47] ATSDR ToxFAQs for Lead, *supra*.

[48] EPA, *Learn About Lead*, last updated May 28, 2026, https://www.epa.gov/lead/learn-about-lead (last accessed June 25, 2026) ("Lead can harm almost every organ and system in your body."); HHS, National Toxicology Program, *NTP Monograph: Health Effects of Low-Level Lead*, June 2012, https://ntp.niehs.nih.gov/sites/default/files/ntp/ohat/lead/final/monographhealtheffectslowlevellead_newissn_508.pdf (last accessed June 25, 2026); A. Spivey, *The Weight of Lead: Effects Add Up in Adults*, Environ. Health Perspectives, Jan. 2007, 115(1): A30-A36, https://pmc.ncbi.nlm.nih.gov/articles/PMC1797860/ (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 26

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

98.     Exposure to high lead levels can severely damage the brain and kidneys, damage male reproductive organs, and even cause death.[49]

99.     Exposure to lead contributed to more than 3.5 million deaths globally in 2023.[50]

100.    During pregnancy, lead can cause premature birth, lower birth weight, harm to the baby's brains, kidneys, and nervous system, and learning or behavior problems.[51] It can be

---

[49] ATSDR ToxFAQs for Lead, *supra*; Geneva Environment Network, *Update: Preventing Lead Poisoning from Geneva: Environmental and Health Impacts of Lead*, last updated May 18, 2026, https://www.genevaenvironmentnetwork.org/resources/updates/lead-poisoning-prevention/ (last accessed June 25, 2026).

[50] WHO: Lead Poisoning, *supra*).

[51] CDC, Childhood Lead Poisoning Prevention, Risk Factors and Pregnancy, March 13, 2025, https://www.cdc.gov/lead-prevention/risk-factors/pregnancy.html (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 27

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

011394-11/5037546 V1

transmitted from pregnant women to their babies during pregnancy[52] This can result in "miscarriage, stillbirth, premature birth, and low birth weight infants."[53]

101.    Lead is particularly dangerous to the health and well-being of small children, and early childhood exposure to lead is known to cause behavioral health problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth, as well as severe neurological effects. Lead exposure in children is linked to learning disabilities, behavioral difficulties, and lowered IQ. Additionally, lead exposure in early childhood is proven to have a strong inverse relationship with test scores, as well as lower reading and math scores in third-grade children.



102.    While lead levels in protein powders are not regulated, approved, reviewed, or tested by United States regulatory bodies, lead ingestion by humans has long been subject to

[52] *Id.*

[53] T. Bhasin, Y. Lamture, M. Kumar, R. Dhamecha, *Unveiling the Health Ramini factions of Lead Poisoning: A Narrative Review,* Cureus, Oct. 9, 2023; 15(1):e46727, doi: 10.7759/cureus.46727; https://pmc.ncbi.nlm.nih.gov/articles/PMC10631288/ (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

regulatory scrutiny. Indeed, the FDA has set a 5 ppb lead standard for bottled water, the WHO has set 10 ppb lead as a provisional guideline for drinking water, and the EPA has set an action level of 15 ppb for lead in drinking water, while acknowledging that "there is no known safe level of lead in a child's blood."[54]

103.    Under the Lead and Copper Rule, if more than 10 percent of tap water samples from a public water system exceed this level, the system is required to take corrective actions.[55] The FDA has set interim reference levels of 2.2 micrograms per day for children and 8.8 micrograms per day for women of childbearing age.[56] It has also set action levels ranges for lead in processed foods intended for infants and young children.[57]

104.    The FDA has also issued non-binding guidance for lead in certain juices (50 ppb) and candy (100 ppb). The EU has set the maximum lead level in infant formula to 20 ppb.

105.    Some public health authorities have adopted more protective standards. For example, New York State recently lowered the action level for lead in school drinking water from 15 ppb to 5 ppb.[58] When lead levels in school fixtures meet or exceed 5 ppb, schools must remove the fixture from service, provide free, alternate drinking water, notify the community, and take steps to remediate the issue.[59]

---

[54] EPA, *Basic Information About Lead in Drinking Water*, Last updated June 18, 2026, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last accessed June 25, 2026).

[55] *Id.*

[56] FDA, *Action Levels for Lead in Processed Food Intended for Babies and Young Children: Guidance for Industry*, Jan. 2025, at 5 https://www.fda.gov/media/164684/download (last accessed June 25, 2026).

[57] *See, generally*, *id.*

[58] The Product's tested concentration of lead is 6.3 micrograms per serving. *See above*. To reach that dose, a school child would need to drink 1.26 liters of water at the action level of 5 ppb of lead.

[59] New York State Education Department: *Lead Testing of Drinking Water*, https://www.nysed.gov/new-york-state-school-deaf/lead-testing-drinking-water (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 29

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

106. There is a growing consensus among health experts that lead levels in food and drinks consumed by children should not exceed 1 ppb. The AAP, the Environmental Defense Fund, and Consumer Reports have all called for this limitation.

**H.    The Contaminated Products Contain Levels of Heavy Metals that are Unhealthy and Unsafe at Any Level**

107. While Defendant's marketing repeatedly communicates that the Contaminated Products are carefully and safely manufactured and clean, laboratory tests show that, in fact, Defendant sold Products containing undisclosed lead levels as high as 67 ppb, cadmium levels as high as 70.3 ppb, and arsenic levels as high as 18 ppb.

108. The Clean Label Project is a national nonprofit "on a mission to bring truth and transparency to food and consumer product labeling."[60]

109. In January 2025, the Clean Label Project published a report that showed 47% of 160 protein powder products tested exceed California's Proposition 65 limits for heavy metals.[61]

110. The Clean Label Project tested the Contaminated Products, neither of which are included on its list of "clean sixteen" nor among the sixteen protein powders that are Clean Label Project Certified.[62]

111. The Clean Label Project collaborated with an analytical chemistry laboratory to test 165 of the top-selling protein powders.[63] It found that 79% of organic protein powders and 77%

---

[60] Clean Label Project , https://cleanlabelproject.org/app/ (last accessed June 25, 2026).

[61] Clean Label Project, "Nearly half of top-selling protein powders exceed safety thresholds for heavy metal contamination," Jan. 9, 2025, https://cleanlabelproject.org/protein-study/ (last accessed June 25, 2026) ("Clean Label Project Protein Study").

[62] Products are tested for purity and chemicals of concern including heavy metals and compares the results to California's Proposition 65 list; if the product is found to comply, it qualifies for Clean Label Certification. Certification also requires ongoing compliance with unannounced sampling and testing. https://cleanlabelproject.org/clean-label-project-certification/ (last accessed June 24, 2026).

[63] Clean Label Project Protein Study, *supra*.

CLASS ACTION COMPLAINT - 30

011394-11/5037546 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

of plant-based protein powders exceeded California's Proposition 65 limit for lead levels.[64] It also found that 47% of the tested products exceeded federal or state regulatory limits set for safety.[65]



112.    Consumer Reports "is an American nonprofit consumer organization dedicated to independent product testing, investigative journalism, consumer-oriented research, public education, and consumer advocacy."[66]

113.    In October 2025, Consumer Reports published a report that showed more than two-thirds of the 23 protein products it tested exceeded its level of concern for lead.[67]

114.    Consumer Reports further found that plant-based protein powders had lead levels nine times higher than dairy-based powders on average.

---

[64] *Id.*

[65] *Id.*

[66] Wikipedia, *Consumer Reports*, https://en.wikipedia.org/wiki/Consumer_Reports (last accessed June 25, 2026).

[67] P. Martineau, Consumer Reports, "Protein powders and shakes contain high levels of lead,", Oct. 14, 2025, Updated Jan. 8, 2026 https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed June 14, 2026) ("Consumer Reports: Protein Powders and Shakes Contain High Levels of Lead").

CLASS ACTION COMPLAINT - 31

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

115. Consumer Reports identified the Orgain Organic Plant-Based Protein Powder in Vanilla Bean as a product "Okay to eat occasionally" with lead levels at 143% of its level for concern and a limit of 4 ¾ servings per week.[68]



116. In introducing Consumer Reports' test results, the Report described the significant health risks for any human consumption of lead, explaining:

> *While no amount of lead is technically safe, the greatest danger comes from repeated or continued exposure, particularly at high doses, says Rose Goldman, MD, an associate professor of medicine and physician at Cambridge Health Alliance in Medford, Mass. Children and pregnant people are most vulnerable because lead can damage the developing brain and nervous system, which has the potential to cause neurological issues, learning delays, and behavioral problems. But chronic lead exposure has also been linked to immune suppression, reproductive problems, kidney damage, and high blood pressure in adults.[69]*

117. To conduct its testing, Consumer Reports:

> *purchased multiple samples of each product, including two to four distinct lots, over a three-month period beginning [November 2024]. CR bought the Contaminated Products anonymously from a*

---

[68] *Id.*

[69] *Id.*

CLASS ACTION COMPLAINT - 32

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*variety of sources, including popular online retailers like Amazon and Walmart, and at supermarkets and health food stores in New York state, such as the Vitamin Shoppe and Whole Foods Market. Then CR tested samples from multiple lots of each product for total protein, arsenic, cadmium, lead, and other elements.*[70]

118. To conduct its study, Consumer Reports analyzed two to three unique samples of the 23 products it tested, which were blind coded and sent to an independent, accredited laboratory for testing in accordance with the Association of Official Analytical Chemists ("AOAC") Method 2015.01. According to Consumer Reports, the "testing conformed to the quality control criteria and performance requirements set in cited official methods, as well as those in ISO 17025."[71]

119. Consumer Reports based its daily exposure limit for lead on the California Proposition 65 (the Safe Drinking Water and Toxic Enforcement Act of 1986) maximum allowable dose level ("MADL") for lead, which is 0.5 micrograms per day.[72]

120. These findings were later confirmed by additional independent testing: Plaintiffs' counsel tested the Contaminated Products and the results confirmed the presence of detectable levels of heavy metals in the Contaminated Products:

| Product | Lead | Cadmium | Arsenic |
|---|---|---|---|
| Orgain Organic Protein Powder in Vanilla Bean | 3.37 µg/serving 67 ppb | 1.19 µg/serving 24 ppb | 0.735 µg/serving 15 ppb |
| Orgain Organic Protein Powder in Vanilla Bean | 0.823 µg/serving 16 ppb | 1.15 µg/serving 23 ppb | 0.577 µg/serving 12 ppb |

[70] *Id.*

[71] Consumer Reports, "Heavy Metals in Protein Supplements," October 2025, at 1 https://article.images.consumerreports.org/image/upload/v1761140939/prod/content/dam/CRO-Images-2025/Special%20Projects/Consumer-Reports-Protein-Powders-and-Shakes-Contain-High-Levels-of-Lead-Methodology-Test-Results-v2.pdf (last accessed June 25, 2026) ("Consumer Reports: Heavy Metals in Protein Supplements").

[72] *See, generally, id.*; *see also* California Office of Environmental Health Hazard Assessment ("OEHHA"), *About Proposition 65*, https://oehha.ca.gov/proposition-65/about-proposition-65#:~:text=Proposition%2065%20requires%20businesses%20to,are%20released%20into%20the%20environment (last accessed June 25, 2026); California OEHHA, *Proposition 65 No Significant Risk Levels (MSRLs) and Maximum Allowable Dose Levels (MADLs)*, https://oehha.ca.gov/proposition-65/general-info/proposition-65-no-significant-risk-levels-nsrls-and-maximum-allowable-dose-levels-madls (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 33

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| Product | Lead | Cadmium | Arsenic |
|---|---|---|---|
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 1.70 µg/serving 34 ppb | 3.45 µg/serving 69 ppb | 0.874 µg/serving 17 ppb |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 2.30 µg/serving 46 ppb | 2.75 µg/serving 55 ppb | 0.920 µg/serving 18 ppb |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | 1.03 µg/serving 20.5 ppb | 3.52 µg/serving 70.3 ppb | 0.710 µg/serving 14.2 ppb |

121. The first sample tested, with a lead level of 3.37 µg/serving, exceeded California's Proposition 65 MADL of 0.5 µg/day by 674%.

122. The laboratory results demonstrate that heavy metals were repeatedly detected across multiple product lots, multiple Costco locations, and both tested flavors. Cadmium was detected in every tested sample. Lead was detected in multiple samples across different lots and locations.

123. Confirmatory testing by Microbac Laboratories, an independent ISO/IEC 17025 accredited laboratory, corroborated the presence of heavy metals in the Contaminated Products.

124. California Proposition 65 a safe harbor MADL for lead of 0.5 µg/day. Sample B1's lead level of 3.37 µg/serving exceeds this safe harbor by approximately 674%.

125. The Proposition 65 MADL for cadmium (oral) is 4.1 µg/day, and the No Significant Risk Level ("NSRL") for inorganic arsenic (oral) is 10 µg/day.

126. The FDA does not review, approve, or test protein powder supplements before they are sold to consumers. Unlike prescription drugs and medical devices, dietary supplements—including protein powders—are not subject to pre-market approval by the FDA. *See* 21 U.S.C. § 342(f)(1) (2005) (placing burden on FDA to prove adulteration after product reaches market). There are no federal regulatory limits for heavy metals in protein supplements or dietary supplements generally. The FDA has not established maximum allowable levels for lead, cadmium, or arsenic in protein powder products, nor has it issued any regulation requiring disclosure of heavy metal content on dietary supplement labels. This regulatory gap means that consumers must rely entirely on the manufacturer's and retailer's voluntary representations regarding product safety and purity—representations that Costco made through its claims of "clean nutrition" and "higher standards" while omitting the presence of toxic heavy metals.

CLASS ACTION COMPLAINT - 34

011394-11/5037546 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

127. However, states have begun to investigate the presence of heavy metals in protein powder products and introduce legislation that would require heavy metals testing.

128. In February 2026, California introduced Senate Bill 1033, which would require mandatory testing and public disclosure of heavy metals in protein products sold in the state.[73]

129. On June 8, 2026, the Texas Attorney General launched an industry-wide investigation into protein powder manufacturers, targeting potential violations of the Texas Deceptive Trade Practices Act related to undisclosed heavy metal contamination.[74]

## I. Defendant Actively Concealed the Truth About the Contaminated Products from Consumers

130. Defendant actively and knowingly concealed from and failed to disclose to consumers, including Plaintiffs and the Classes, that the Contaminated Products it sells to consumers contain or materially risk containing heavy metals, including lead, cadmium, and arsenic.

131. Defendant actively and knowingly concealed and failed to disclose material facts to Plaintiffs and other consumers about the negative health effects of the Contaminated Products it sells.

132. Information regarding the presence of heavy metals in the Contaminated Products is in the exclusive possession of Costco and not readily available to consumers. Defendant chose to not disclose such information to consumers and thus actively concealed the presence of heavy metals in the Contaminated Products.

133. Defendant knowingly and actively concealed the material facts from consumers because it knew consumers cared about the Contaminated Products' quality, ingredients,

---

[73] *California Senate Bill 1033*, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202520260SB1033 (last accessed June 25, 2026).

[74] *Press release: Attorney General Ken Paxton Launches Industry-Wide Investigation into Protein Powder Manufacturers to Protect Texans from Heavy Metals, Including Lead and Cadmium, Found in Popular Protein Powders*, June 8, 2026, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-industry-wide-investigation-protein-powder-manufacturers (last accessed June 25, 2026).

CLASS ACTION COMPLAINT - 35

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

standards, and suitability for use, and if consumers were to learn the truth about Costco's claims, it would negatively affect its finances.

134.    Defendant knew or should have known of the negative health effects caused by exposure to heavy metals, yet knowingly and actively concealed the presence or material risk of heavy metals in the Contaminated Products.

135.    The knowing and active concealment of these material facts render the point-of-sale for the Contaminated Products' deceptive, misleading, and unfair because without full disclosure, reasonable consumers, including Plaintiffs and the Classes, believe the Contaminated Products to be of a certain quality and suitable for use when they are not.

136.    Plaintiffs and the Class Members made purchases they would not have made or paid a premium price for the Contaminated Products they would not have paid had they known the truth based on Defendant's active concealment, Omissions, Misrepresentations, and partial representations regarding the presence or material risk of heavy metals in the Contaminated Products.

137.    Defendant charged, and Plaintiffs purchased, the Contaminated Products, paying a premium price, despite the availability of comparable, lesser-priced protein powder products sold by other retailers with no detectable levels of heavy metals.

| The Contaminated Products | Price/oz | Lead (ppb) | Arsenic (ppb) | Cadmium (ppb) |
|---|---|---|---|---|
| Orgain Organic Protein Powder in Vanilla Bean | $0.79/oz | 16-67 | 12-15 | 23-24 |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | $0.80/oz | 20.5-46 | 14.2-18 | 55-70.3 |
| Competitor Products | Price/oz | Lead (ppb) | Arsenic (ppb) | Cadmium (ppb) |
| Muscle Tech 100% Mass Gainer Vanilla[75] | $0.42/oz | ND | 5.2 | ND |
| Dymatize Super Mass Gainer, Gourmet Vanilla[76] | $0.49/oz | 0.4 | 6.1 | ND |

[75] Consumer Reports: Heavy Metals in Protein Supplements, *supra.*

[76] *Id.*

CLASS ACTION COMPLAINT - 36

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| The Contaminated Products | Price/oz | Lead (ppb) | Arsenic (ppb) | Cadmium (ppb) |
|---|---|---|---|---|
| Premier Protein 100% Whey, Vanilla Milkshake[77] | $0.65/oz | ND | ND | ND |
| Transparent Labs Mass Gainer Vanilla[78] | $0.78/oz | 2.2 | 2.7 | ND |

138. The facts misrepresented, concealed, omitted, or not disclosed by Defendant were material such that reasonable consumers, including Plaintiffs and the Classes, would have considered them when deciding whether to purchase the Contaminated Products. Had Plaintiffs known the truth, they would not have purchased the Contaminated Products or paid the premium price.

139. Defendant has been on notice about the problematic presence of heavy metals in organic and plant-based protein powders such as the Contaminated Products. In 2018, the Clean Label Project published a report where it tested 134 of the top-selling protein powder products where it found plant-based products tested worst, 75% of plant-based samples tested positive for lead, and certified organic protein powder products on average tested more than two times the levels of heavy metals compared to non-organic products tested.[79]

**J.     Protein Powder Products Sold by Costco Can Be Manufactured Without Heavy Metals**

140. It is possible to manufacture protein powder products with non-detectable levels of heavy metals, including lead, cadmium, and arsenic.

141. Consumer Reports tested MuscleTech's 100% Mass Gainer Vanilla Milkshake product and found no detectable levels of lead or cadmium[80] and the Clean Label Project tested 16

---

[77] Clean Label Project, *Clean Sixteen*, https://cleanlabelproject.org/wp-content/uploads/CLPSweet-16OneSheeter_061125.pdf (last accessed June 25, 2026) ("Clean Sixteen").

[78] Consumer Reports: Heavy Metals in Protein Supplements, *supra*.

[79] Clean Label Project, "Protein Powder Infographic," https://cleanlabelproject.org/protein-powder-infographic/ (last accessed June 25, 2026).

[80] Consumer Reports: Protein Powders and Shakes Contain High Levels of Lead, *supra*.

CLASS ACTION COMPLAINT - 37

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

protein powders that had no detectable levels of lead, cadmium, or arsenic, including Premier Protein's 100% Whey Vanilla Milkshake.[81]

142.    Seven products tested by Consumer Reports were categorized as "Better Choices for Daily Consumption," with six products at less than 88% of Consumer Reports' concern for lead per serving and one product with no detectable level of lead.[82]

143.    Additionally, Lead Safe Mama tested another protein powder with no detectable levels of heavy metals, including arsenic, cadmium, and lead.[83]

144.    Finally, the Clean Label Product testing showed sixteen products had non-detectable levels of heavy metals:[84]

---

[81]  Clean Sixteen, *supra*.

[82] Consumer Reports: Protein Powders and Shakes Contain High Levels of Lead, *supra*.

[83] Lead Safe Mama, *Testing Simply Tera's Organic Whey Protein (Plain, Unsweetened) for Lead, Cadmium, Mercury, and Arsenic with Independent, Third-Party Laboratory Analysis* (Oct. 25, 2025, updated Oct. 29, 2025), https://tamararubin.com/2025/10/simply-teras-organic-whey-protein/ (last accessed June 25, 2026).

[84] Clean Sixteen, *supra*.

CLASS ACTION COMPLAINT - 38

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



## K.    The Material Omissions and Misrepresentations Mislead and Deceive Reasonable Consumers

145.    Defendant does not disclose anywhere on the product pages for the Contaminated Products (or anywhere else) that the Contaminated Products contain heavy metals. Those point-of-sale list the ingredients of the Contaminated Products but omit any mention of heavy metals, including lead, cadmium, or arsenic.

146.    The presence of heavy metals in the Contaminated Products is material to consumers.

147.    Defendant's Omissions wrongfully cause reasonable consumers to believe that Products do not contain heavy metals, when in fact the Contaminated Products do contain heavy metals, including lead, cadmium, and/or arsenic.

148.    Information regarding the presence of heavy metals in the Contaminated Products is in the exclusive possession of Defendant and not readily available to consumers. Defendant chose to not disclose such information to consumers and thus actively concealed the presence of heavy metals in the Contaminated Products.

CLASS ACTION COMPLAINT - 39

011394-11/5037546 V1

149. Reasonable consumers must and do rely on Defendant to honestly report what Products it sells contain.

150. Because of Defendant's failure to disclose the presence of heavy metals on the Contaminated Products' point-of-sale, no reasonable consumer would expect, suspect, or understand that the Contaminated Products contain heavy metals.

151. Defendant had a duty to ensure the Contaminated Products were not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

152. The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.

153. The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the other Class Members, to purchase products they would not have purchased if Defendant had disclosed that the Contaminated Products contained heavy metals, or for which they would not have paid a premium price, or any price at all.

154. As a result of the Omissions, Defendant generated substantial sales and profited from Plaintiffs' lack of information about the presence of heavy metals in the Contaminated Products.

155. Plaintiffs and other reasonable consumers would not have purchased the Contaminated Products or would have paid less for them but for the Misrepresentations, partial misrepresentations, Omissions, concealment, and other deceptive conduct.

156. The Contaminated Products' point-of-sale misled and deceived reasonable consumers because Defendant omitted that the Contaminated Products contained or had a material risk of containing heavy metals, while representing the Contaminated Products' health benefits.

157. Based on Defendant's Misrepresentations, partial misrepresentations, and Omissions, and the overall impression given by the point-of-sale, no reasonable consumer could expect or understand the Contaminated Products contained or had a material risk of containing heavy metals such as cadmium and lead.

CLASS ACTION COMPLAINT - 40

011394-11/5037546 V1

**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

158. Defendant's point-of-sale for the Contaminated Products contradict the presence of heavy metals such as lead, cadmium, and arsenic; such communications include the following Misrepresentations, for example:

a.  Orgain Organic Protein Powder in Vanilla Bean; and

- "Good, clean nutrition"
- "Cleaner ingredients"
- "Higher standards"
- "Our commitment to clean nutrition"
- "The power of clean"
- "Quality ingredients, higher standards"
- "good, clean fuel"
- "clean, lean organic machine"
- "Delivering clean nutrition"

b.  Orgain Organic Protein Powder in Creamy Chocolate Fudge.

- "Good, clean nutrition"
- "Cleaner ingredients"
- "Higher standards"
- "Our commitment to clean nutrition"
- "The power of clean"
- "Quality ingredients, higher standards"
- "good, clean fuel"
- "clean, lean organic machine"
- "Delivering clean nutrition"

159. The Misrepresentations and Omissions misleadingly convey to consumers that the Contaminated Products are of a high quality and have certain characteristics that they do not actually possess.

CLASS ACTION COMPLAINT - 41

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

160. Defendant misleadingly causes consumers to believe the Contaminated Products it sells do not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and arsenic, due to the material Omissions, Misrepresentations and partial misrepresentations, when in fact the Contaminated Products do contain (or have a material risk of containing) lead, cadmium, and/or arsenic.

161. Whether the Contaminated Products contain heavy metals is material information to reasonable consumers, including Plaintiffs.

162. Defendant wrongfully failed to disclose to reasonable consumers material information regarding the presence of (or material risk of) heavy metals in the Contaminated Products.

163. Due to the point-of-sale, Misrepresentations, partial misrepresentations, and Omissions, reasonable consumers, like Plaintiffs, would not suspect the presence of heavy metals in the Contaminated Products.

164. Unlike Defendant, reasonable consumers are not able to independently detect the presence of heavy metals in the Contaminated Products and are generally without the means to conduct their own scientific tests on the Contaminated Products.

165. Moreover, information regarding the presence of heavy metals in the Contaminated Products is in the exclusive possession of Defendant and not available to consumers. Defendant chose to not disclose such information to consumers and thus actively concealed the presence and risk of heavy metals in the Contaminated Products.

166. Reasonable consumers must and do rely on Defendant to honestly report what the Contaminated Products it sells contain.

167. Based on the failure to disclose the presence (or material risk) of heavy metals on the Contaminated Products' point-of-sale, no reasonable consumer would expect, suspect, or understand that the Contaminated Products contained or had a material risk of containing heavy metals.

CLASS ACTION COMPLAINT - 42

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

168. In light of Defendant's statements regarding the quality of the Contaminated Products, Defendant knew or should have known the Contaminated Products contained or had a material risk of containing heavy metals.

169. Defendant had a duty to ensure the Contaminated Products it sold were not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

170. Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive point-of-sale based on the material Misrepresentations, partial misrepresentations, and Omissions.

171. The Misrepresentations, partial misrepresentations, and Omissions on Defendant's point-of-sale are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.

172. The Misrepresentations, partial misrepresentations, and Omissions, make the Contaminated Products' point-of-sale deceptive based on the presence or risk of significant levels heavy metals in the Contaminated Products. Reasonable consumers, like Plaintiffs, would consider the presence or risk of heavy metals in the Contaminated Products a material fact when considering which protein powder products to purchase.

173. Defendant knew, yet failed to disclose, that the Contaminated Products or the ingredients used in the Contaminated Products were not sufficiently or adequately monitored or tested for heavy metals.

174. The Misrepresentations, partial misrepresentations, and Omissions, were misleading due to Defendant's failure to ensure the Contaminated Products were sufficiently or adequately monitored or tested for heavy metals and to disclose the presence (or material risk) of heavy metals in the Contaminated Products.

175. Defendant knew or should have known that the Contaminated Products contained or may contain levels of heavy metals that were not disclosed on the point-of-sale.

CLASS ACTION COMPLAINT - 43

**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

176. Defendant knew or should have known that reasonable consumers, including Plaintiffs, expected it to ensure the Contaminated Products it sold were sufficiently monitored and tested for heavy metals and to disclose the presence or risk of heavy metals in the Contaminated Products.

177. Further, Defendant knew or should have known that reasonable consumers paid higher prices, or paid any price at all, for the Contaminated Products and expected the Contaminated Products sold by Defendant were sufficiently tested and monitored for the presence of heavy metals.

178. The Misrepresentations, partial misrepresentations, and Omissions are material and render the Contaminated Products' point-of-sale deceptive because without full disclosure, reasonable consumers, such as Plaintiffs, believe the Contaminated Products do not contain or have a material risk of containing heavy metals.

179. Defendant charged, and Plaintiffs purchased, the Contaminated Products, paying a premium price, despite the availability of comparable, lesser-priced protein powder products sold by other retailers with no detectable levels of heavy metals.

| The Contaminated Products | Price/oz | Lead (ppb) | Arsenic (ppb) | Cadmium (ppb) |
|---|---|---|---|---|
| Orgain Organic Protein Powder in Vanilla Bean | $0.79/oz | 16-67 | 12-15 | 23-24 |
| Orgain Organic Protein Powder in Creamy Chocolate Fudge | $0.80/oz | 20.5-46 | 14.2-18 | 55-70.3 |
| Competitor Products | Price/oz | Lead (ppb) | Arsenic (ppb) | Cadmium (ppb) |
| Muscle Tech 100% Mass Gainer Vanilla[85] | $0.42/oz | ND | 5.2 | ND |
| Dymatize Super Mass Gainer, Gourmet Vanilla[86] | $0.49/oz | 0.4 | 6.1 | ND |
| Premier Protein 100% Whey, Vanilla Milkshake[87] | $0.65/oz | ND | ND | ND |
| Transparent Labs Mass Gainer Vanilla[88] | $0.78/oz | 2.2 | 2.7 | ND |

[85] Consumer Reports: Heavy Metals In Protein Supplements, *supra*.

[86] *Id.*

[87] *Clean Sixteen*, *supra*.

[88] Consumer Reports: Heavy Metals In Protein Supplements, *supra*.

CLASS ACTION COMPLAINT - 44

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

180. As a result of Defendant's deceptive, unfair, and misleading Misrepresentations, partial misrepresentations, and Omissions, it was able to generate substantial sales, which allowed it to reap enormous profits from Plaintiffs and similarly situated consumers who paid the purchase price or premium for the Contaminated Products that were not as advertised.

181. Plaintiffs and other reasonable consumers would not have purchased the Contaminated Products or would have paid less for them but for the misrepresentations and partial misrepresentations, including the Misrepresentations and Omissions.

**L.     Costco's Knowledge and Failure to Disclose**

182. As a major national retailer with sophisticated supply-chain management and quality control processes, Costco knew or should have known about the heavy metals in the Contaminated Products it sells, including the Contaminated Products.

183. Despite this knowledge, or constructive knowledge, Costco continued to sell the Contaminated Products without any warning or disclosure to consumers regarding the presence or material risk of heavy metals in the Contaminated Products.

184. Reasonable consumers, like Plaintiffs, could not learn of the inclusion of heavy metals in the Contaminated Products unless Costco included a proper disclosure, because identifying the presence of heavy metals requires expensive and sophisticated laboratory testing. But Costco failed to perform or require any heavy metal testing, or to disclose the presence of heavy metals.

185. Based on the messaging and overall impression communicated by Costco's point-of-sale, including the material Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct, no reasonable consumer purchasing protein powder products would expect the Contaminated Products to contain heavy metals, especially since the Contaminated Products are marketed as high quality, clean, and nutritious, and intended to be ingested.

186. The "Organic" labeling on the Contaminated Products creates a misleading impression of purity and safety. USDA Organic certification addresses the use of synthetic

CLASS ACTION COMPLAINT - 45

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

pesticides, fertilizers, and genetically modified organisms, but does not test for or certify the absence of heavy metals such as lead, cadmium, and arsenic.

187. A reasonable consumer would not expect "Organic" protein powder to contain lead at levels exceeding recognized safety thresholds by more than 600%. The absence of any warning or disclosure regarding heavy metal content, combined with the prominent "Organic" labeling, creates a deceptive net impression regarding product safety.

188. Defendant had a duty to ensure the Contaminated Products were not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

189. Costco's failure to disclose was not the result of ignorance or inability. As one of the largest retailers in the world, with annual revenues exceeding $240 billion, Costco has the resources and capability to test products for heavy metal contamination and to require disclosure from its suppliers.

190. Plaintiffs' claims are not preempted by federal law. Plaintiffs do not allege that Costco violated the Federal Food, Drug, and Cosmetic Act ("FDCA") or the Nutrition Labeling and Education Act ("NLEA"), nor do they seek to enforce any federal labeling requirement. Rather, Plaintiffs bring their claims exclusively under the Washington Consumer Protection Act, which independently prohibits unfair or deceptive acts or practices in trade or commerce. Plaintiffs' claims exist independently of any federal labeling requirement because they are based on Costco's affirmative misrepresentations that the Contaminated Products are "clean," "nutritious," and held to "higher standards"—claims that are deceptive under state law regardless of any federal labeling obligation. Plaintiffs do not seek to impose labeling requirements that are "in addition to" or "different from" those required by federal law. *See* 21 U.S.C. § 343-1(a) (2010). Instead, Plaintiffs challenge Costco's voluntary affirmative representations and omissions that deceive consumers about the actual quality and safety of the Contaminated Products.

191. The NLEA contains a "savings clause" that expressly disavows implied preemption: "The [NLEA] shall not be construed to preempt any provision of State law, unless

CLASS ACTION COMPLAINT - 46

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

such provision is expressly preempted under [21 U.S.C. § 343–1(a)]." Pub. L. No. 101–535, § 6(c)(1). Moreover, the FDCA does not occupy the field of food safety and consumer protection; it establishes a regulatory "floor," not a "ceiling." States retain the historic police power to protect their citizens from deceptive trade practices, and private enforcement of state consumer protection laws coexists with—and is complementary to—FDA regulation. *See Wyeth v. Levine*, 555 U.S. 555, 579 (2009) (state law provides "an additional, and important, layer of consumer protection that complements FDA regulation"). Critically, the FDA does not review, approve, or test dietary supplements—including protein powders—before they are sold to consumers, and has established no regulatory limits for heavy metals in protein supplements or dietary supplements. Where the FDA has neither established standards nor exercised its enforcement authority, preemption is particularly inappropriate.

192. Furthermore, the implied preemption doctrine applies only where a plaintiff's claims "exist 'solely by virtue'" of an alleged FDCA infraction. *See DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41 (1st Cir. 2023) (citation omitted). That doctrine has no application here. Plaintiffs do not allege that Costco's labels violate any FDA regulation; they allege that Costco's affirmative marketing claims—"good, clean nutrition," "cleaner ingredients," "higher standards"—are misleading because those voluntary representations are contradicted by the undisclosed presence of toxic heavy metals in the Contaminated Products. These claims would be actionable under the Washington CPA whether or not the FDCA existed, because they are grounded in Costco's own deceptive marketing practices, not any federal requirement.

## V.    CLASS ACTION ALLEGATIONS

193. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Classes:

> **Nationwide Class**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com for household use and not for resale (the "Class").

> **Washington Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the

CLASS ACTION COMPLAINT - 47

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of Washington for household use and not for resale (the "Washington Subclass").

**California Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of California for household use and not for resale (the "California Subclass").

**Illinois Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of Illinois for household use and not for resale (the "Illinois Subclass").

**Minnesota Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of Minnesota for household use and not for resale (the "Minnesota Subclass").

**Ohio Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of Ohio for household use and not for resale (the "Ohio Subclass").

**Texas Subclass**: All persons who, from the beginning of the applicable statute of limitations period to the present, purchased the Contaminated Products from a Costco Wholesale Corporation retail warehouse location or Costco.com in the State of Texas for household use and not for resale (the "Texas Subclass").

194. Members of the Class, Washington Subclass, California Subclass, Illinois Subclass, Minnesota Subclass, Ohio Subclass, and Texas Subclass are sometimes, where appropriate, referred to herein collectively as "Class Members" or the "Classes."

195. Excluded from the Classes are: (a) Defendant, its officers, directors, employees, agents, and affiliates; (b) the Judge(s) assigned to this case and their immediate family members; (c) any member of the Classes who timely and validly opts out of the Class; and (d) any entity in which Defendant has a controlling interest.

196. **Numerosity (FRCP 23(a)(1)):** The Classes consist of thousands, if not tens of thousands, of consumers. The Contaminated Products are regularly stocked items at Costco's approximately 600 U.S. warehouse locations and are sold through Costco.com. Costco is one of

CLASS ACTION COMPLAINT - 48

**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

011394-11/5037546 V1

the largest retailers in the United States, with more than 130 million cardholders. Given that the Contaminated Products are among Costco's regularly stocked dietary supplement items, sold continuously throughout the Class Period at warehouse locations nationwide and online, the number of Class Members is necessarily large. The exact number of Class Members is readily ascertainable from Costco's sales records, membership transaction data, and point-of-sale systems, which track every purchase by member number. Joinder of all Class Members is impracticable due to the large number of geographically dispersed Class Members.

197. **Commonality (FRCP 23(a)(2)):** There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class Members. These common questions are capable of generating common answers that will drive the resolution of the litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The deceptive conduct at issue—Costco's uniform failure to disclose heavy metals in the Contaminated Products while making uniform affirmative representations of "clean nutrition" and "higher standards"—was identical as to all Class Members. Whether such conduct constitutes an unfair or deceptive practice is answerable on a class-wide basis without reference to individual circumstances. Common questions include:

a.    Whether Costco engaged in unfair or deceptive acts or practices;

b.    whether the Misrepresentations, partial misrepresentations, and Omissions were material to a reasonable consumer;

c.    whether Costco had knowledge that the Misrepresentations, partial misrepresentations, and Omissions were material, false, deceptive, and misleading;

d.    whether Costco owed a duty to disclose;

e.    whether Costco knew or should have known that the Contaminated Products contained or may contain detectable levels of heavy metals, including lead, cadmium, and/or arsenic;

f.    whether Costco failed to disclose that the Contaminated Products contained or may contain detectable levels of heavy metals, including lead, cadmium, and/or arsenic;

g.    whether Costco had exclusive knowledge of the Omissions;

CLASS ACTION COMPLAINT - 49

011394-11/5037546 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

h.    whether Plaintiffs could have reasonably discovered the Omissions;

i.    whether Costco violated Washington state law;

j.    Whether Costco violated California state law;

k.    Whether Costco violated Illinois state law;

l.    Whether Costco violated Minnesota state law;

m.    Whether Costco violated Ohio state law;

n.    Whether Costco violated Texas state law;

o.    Whether Costco's conduct occurred in trade or commerce within the meaning of RCW 19.86.010(2);

p.    Whether Costco's conduct affects the public interest;

q.    Whether Class Members suffered injury to their business or property;

r.    Whether Costco's conduct caused Class Members' injuries; and

s.    whether Plaintiffs and the Class Members are entitled to actual, statutory, and punitive damages; and

t.    whether Plaintiffs and the Class Members are entitled to declaratory and injunctive relief.

198.    These common questions are capable of generating common answers that will drive the resolution of the litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

199.    **Typicality (FRCP 23(a)(3)):** Plaintiffs' claims are typical of the claims of the Classes because they arise from the same course of conduct by Costco—namely, the sale of Orgain Organic Protein Powder products containing undisclosed heavy metals without any warning or disclosure. Plaintiffs and all Class Members were exposed to the same packaging, the same product webpage representations, and the same material omissions regarding heavy metal content. Plaintiffs and all Class Members were subject to the same deceptive Misrepresentations and Omissions and suffered the same type of injury: economic loss from purchasing products they would not have purchased, or would have paid less for, had the contamination been disclosed. The claims do not require any individualized proof unique to the named Plaintiffs—the same representations, the same omissions, and the same laboratory test results establish liability as to all

CLASS ACTION COMPLAINT - 50

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Class Members. No defense unique to the named Plaintiffs exists that would render their claims atypical.

200.   **Adequacy (FRCP 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with, and are not antagonistic to, the interests of other Class Members. Plaintiffs have retained counsel experienced in consumer protection and class action litigation who will adequately represent the interests of the Classes.

201.   **Predominance (FRCP 23(b)(3)):** Common questions of law and fact predominate over any questions affecting only individual Class Members. The central issues in this case— whether Costco's sale of products with undisclosed heavy metals constitutes an unfair, misleading, and/or deceptive practice under the Washington, California, Illinois, Minnesota, Ohio and/or Texas law, whether such conduct affects the public interest, and the appropriate measure of damages— are common to all Class Members and can be resolved on a class-wide basis.

202.   Individual issues, if any, do not predominate. Costco's failure to disclose was uniform across all sales of the Contaminated Products. The materiality of the omitted information—including the presence of lead at levels exceeding recognized safety thresholds by more than 600%—can be assessed on a class-wide basis under an objective "reasonable consumer" standard.

203.   **Superiority (FRCP 23(b)(3)):** A class action is the superior method for the fair and efficient adjudication of this controversy. Individual Class Members' damages may be relatively small compared to the expense and burden of individual litigation, making it impractical for individual Class Members to seek redress on their own. A class action efficiently adjudicates the claims of all members in a single proceeding, avoids inconsistent adjudications, and conserves judicial resources.

204.   Class treatment is manageable because Costco's sales records, membership transaction data, and point-of-sale systems will identify Class Members and their purchases, and the legal and factual issues are common to the Class.

CLASS ACTION COMPLAINT - 51

011394-11/5037546 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

205.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## VI.   CLAIMS FOR RELIEF

### COUNT I

**Violation of the Washington Consumer Protection Act, Wash. Rev. Code Ann. §19.86.010, *et seq*. Against Defendant on Behalf of the Class, or Alternatively, on Behalf of Plaintiff Barton and the Washington Subclass**

206.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

207.   Plaintiffs bring this Count on behalf of all Class Members.

208.   Washington's Consumer Protection Act ("Washington CPA") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Wash. Rev. Code Ann. §19.86.020.

209.   Costco's acts complained of herein are deceptive and unfair within the meaning of the Washington CPA. Wash. Rev. Code Ann. §19.96.010.

210.   Costco committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of the Washington CPA. Wash. Rev. Code Ann. §19.86.010. Costco's decision to offer the Contaminated Products for sale was made from its offices in Washington as was its approval of the material on Costco's website that describe the Contaminated Products.

211.   To establish a claim under the Washington CPA, a plaintiff must prove five elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) injury to the plaintiff in his or her business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

212.   Costco's deceptive and unfair practices, as alleged herein, are injurious to the public interest as they have the capacity to injure other persons, including the millions of consumers who shop at its stores and on its website.

CLASS ACTION COMPLAINT - 52

011394-11/5037546 V1

213. Costco's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein were directed at the consumer public at-large as they repeatedly occurred in the course of Costco's business and were capable of deceiving a substantial portion of the consuming public.

214. The facts concealed or not disclosed or misrepresented by Costco were material facts in that Plaintiffs and the Class, and other reasonable consumers, would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiffs and the Class Members known the Contaminated Products did not have the quality, ingredients, standards, and suitability for use as advertised by Costco and contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic, they would not have purchased the Contaminated Products or paid a premium price.

215. Costco alone possessed the information that was material to Plaintiffs and the Class and failed to disclose such material information to consumers.

216. Costco intended for Plaintiffs and the Class Members to rely on its Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products' quality, ingredients, standards, and suitability for use when purchasing the Contaminated Products, unaware of the undisclosed material facts.

217. Plaintiffs and the Class Members did in fact rely on the material misrepresentations and partial misrepresentations, including the Misrepresentations, and Omissions and purchased the Contaminated Products to their detriment. Given the materiality of the Omissions, Plaintiffs and the Class's reliance on the misrepresentations, partial misrepresentations, and Omissions were justifiable.

218. Plaintiffs and the Class Members purchased the Contaminated Products that contain undisclosed levels of heavy metals, including lead, cadmium, and arsenic, despite the availability of other protein powder products with non-detectable levels of heavy metals.

CLASS ACTION COMPLAINT - 53

011394-11/5037546 V1



219. Costco charged, and Plaintiffs and the Class Members paid, a premium price for the Contaminated Products despite the availability of other protein powder products with non-detectable levels of heavy metals.

220. The misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct caused Plaintiffs and the Class Members to suffer injury in the form of actual damages when they purchased the Contaminated Products that were worth less than the price paid and that they would not have purchased at all had they known the Contaminated Products contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic.

221. Plaintiffs and the Class Members have been harmed, and that harm will continue unless Costco is enjoined from further omitting the true quality, ingredients, standards, and suitability for use of the Contaminated Products.

222. As a direct and proximate result of Costco's conduct, Plaintiffs and the Class suffered quantifiable economic injury to their business or property by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and/or arsenic; (2) purchasing Products they would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented. This injury constitutes a tangible, quantifiable economic loss—not merely "dashed expectations"—sufficient to satisfy the Washington CPA's requirement of injury to "business or property" under RCW §19.86.090.

223. The price premium paid by Plaintiffs and the Class is quantifiable and measurable. As set forth above, the Contaminated Products were sold at $0.79-$0.80/oz, while comparable protein powder products with non-detectable levels of heavy metals were available at prices as low as $0.42/oz. The difference between the price paid and the value received—given the undisclosed

CLASS ACTION COMPLAINT - 54

**HAGENS BERMAN**

presence of toxic heavy metals—constitutes a concrete, measurable financial loss that can be calculated on a per-unit and per-Class-Member basis using Costco's sales records.

224. Costco is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under RCW §19.86.090.

## COUNT II

**Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*.**
**(On behalf of Plaintiff Levine, Plaintiff Morgan and the California Subclass)**

225. Plaintiff Levine and Plaintiff Morgan ("Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

226. Plaintiffs bring this Count on behalf of all California Subclass Members.

227. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

Fraudulent

228. A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

229. As set forth herein, Defendant's material misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct as described herein related to the Contaminated Products are likely to deceive reasonable consumers and a significant portion of the public. Specifically, Defendant's material Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct as described herein misleadingly marketed to reasonable consumers that the Contaminated Products were high quality, clean, and nutritious and did not contain or risk containing heavy metals, including lead, cadmium, and arsenic.

Unlawful

230. A business act or practice is "unlawful under the UCL if it violates any other law or regulation.

CLASS ACTION COMPLAINT - 55

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

231.   As alleged herein, Defendant advertised and marketed the Contaminated Products with material misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct, such that Defendant's actins violate at least the CLRA, California Business and Professions Code sections 1750, *et seq.*; California's False Advertising Law, California Business and Professions Code sections 17500, *et seq.*; and any other applicable laws described herein.

Unfair

232.   A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

233.   Defendant's conduct with respect to the advertising, marketing, and sale of the Contaminated Products was unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

234.   Defendant's conduct with respect to the advertising, marketing, and sale of the Contaminated Products is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid. Specifically, the increase in profits obtained by Defendant through the misleading advertising, marketing, and sale of the Contaminated Products does not outweigh the harm to the Plaintiffs and members of the California Subclass who were deceived into purchasing the Contaminated Products unaware that they contain heavy metals and are of the type that can increase the risk of detriment to their health. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research into the heavy metal content of the Contaminated Products, which could only feasibly be revealed by laboratory testing, which is not a reasonable expectation. Further, the harm could have easily been avoided by Defendant as the costs would be minimal to indicate to consumers that the Contaminated Products

CLASS ACTION COMPLAINT - 56

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

contain heavy metals or that these toxins can accumulate over time in the body to the point where detrimental health effects can occur.

235. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Contaminated Products to unsuspecting consumers.

236. Plaintiffs and other members of the California Subclass are likely to continue to be damaged by Defendant's unlawful, unfair, and/or fraudulent acts or practices because Defendant continues to disseminate misleading information. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

237. Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and the other members of the California Subclass, who suffered injury in fact as a result of Defendant's unlawful conduct.

238. Defendant charged, and Plaintiffs and California Subclass Members paid, a premium price for the Contaminated Products despite the availability of comparable, lesser-priced protein powder products from other manufacturers.

239. In accordance with California Business & Professions Code section 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

240. Plaintiffs also seek an order for the restitution of all monies from the sale of the Contaminated Products that were unjustly acquired by Defendant through its acts of unlawful competition.

241. Because Plaintiffs' and the California Subclass Members' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the CLRA or UCL's "fraudulent" prong, their legal remedies are inadequate to fully compensate them for all of Defendant's behavior.

CLASS ACTION COMPLAINT - 57

011394-11/5037546 V1

COUNT III

**Violations of California's False Advertising Law, Cal. Bus. & Prof. Code §17500,** *et seq.*
**(On behalf of Plaintiff Levine, Plaintiff Morgan and the California Subclass)**

242. Plaintiff Levine and Plaintiff Morgan ("Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

243. California's False Advertising Law ("FAL") provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services … to make or disseminate or cause to be made or disseminated …any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

244. As alleged herein, Defendant misleadingly marketed to reasonable consumers that the Contaminated Products were high quality, clean, and nutritious, and did not contain heavy metals. Plaintiffs and members of the California Subclass suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Contaminated Products in reliance on Defendant's false and misleading marketing claims stating or suggesting that the Contaminated Products were high quality, clean, and nutritious and do not contain heavy metals.

245. Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant advertised the Contaminated Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known.

246. Defendant profited from the sale of the falsely and deceptively advertised Contaminated Products to unsuspecting consumers, including Plaintiffs and the California Subclass.

247. Defendant's acts and practices deceived Plaintiffs and members of the California Subclass at large. Plaintiffs and members of the California Subclass relied on Defendant's misleading and deceptive representations.

CLASS ACTION COMPLAINT - 58


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

248. Through its unfair acts and practices, Defendant unlawfully obtained money from Plaintiffs and the California Subclass. As such, Plaintiffs request that this Court order Defendant to restore this money to them and all members of the California Subclass. Plaintiffs further seek an award of attorneys' fees and costs under California Code of Civil Procedure section 1021.5.

249. Pursuant to California Business and Professions Code section 17535, Plaintiffs, on behalf of themselves and members of the California Subclass, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth herein.

250. Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA, and restitution is not limited to returning to Plaintiffs and members of the California Subclass monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies under the CLRA and commercial code are more limited than the equitable remedies under the FAL, and are therefore inadequate.

## COUNT IV

**Violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq*.**
**(On behalf of Plaintiff Levine, Plaintiff Morgan, and the California Subclass)**

251. Plaintiff Levine and Plaintiff Morgan ("Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

252. Plaintiffs and each member of the California Subclass are consumers within the meaning of California Civil Code section 1761(d) and have engaged in transactions within the meaning of California Civil Code sections 1761(e) and 1770.

253. Defendant is a "person" within the meaning of California Civil Code section 1761(c).

254. The Contaminated Products are "goods" within the meaning of California Civil Code sections 1761(a).

CLASS ACTION COMPLAINT - 59

011394-11/5037546 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

255. Plaintiffs and each California Subclass Member's purchases of the Products constituted a "transaction" as that term is defined in California Civil Code section 1761(e).

256. Defendant's conduct alleged herein violates the following provisions of the CLRA:

a) California Civil Code section 1770(a)(5), by failing to make any mention of the presence (or risk) of heavy metals in the Contaminated Products;

b) California Civil Code section 1770(a)(7), by knowingly, recklessly, and/or intentionally representing that the Contaminated Products were of a particular standard, quality, or grade, when they were of another;

c) California Civil Code section 1770(a)(9), by knowingly, recklessly, and/or intentionally advertising the Contaminated Products with intent not to sell them as advertised; and

d) California Civil Code section 1770(a)(16), by representing that the Contaminated Products have been supplied in accordance with previous statements when they have not.

257. Defendant profited from the sale of the misleadingly, falsely, deceptively, and unlawfully advertised Products to unsuspecting consumers. Specifically, Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive, unfair, and misleading conduct described herein misleadingly marketed to reasonable consumers that the Contaminated Products were high quality, clean, and nutritious, and did not contain or risk containing heavy metals, including lead, cadmium, and arsenic.

258. Defendant made both misrepresentations and partial misrepresentations, including the Misrepresentations, that required it to fully disclose the presence and material risk of heavy metals in the Contaminated Products.

259. Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

CLASS ACTION COMPLAINT - 60

011394-11/5037546 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

260. Plaintiffs sent notice of the violations herein to Defendant pursuant to the CLRA on July 2, 2026.

261. Plaintiffs and members of the California Subclass have suffered harm and seek injunctive relief under the CLRA.

COUNT V

**Violations of the Illinois Consumer Fraud and Deceptive Practices Act,
815 Ill. Comp. Stat. §505/1, *et seq.*
(On behalf of Plaintiff Jaroll and the Illinois Subclass)**

262. Plaintiff Jaroll incorporates by reference all preceding paragraphs as though fully set forth herein.

263. Defendant's misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct as described herein constitute a violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"). 815 Ill. Comp. Stat. § 505/1, et seq.

264. Plaintiff Jaroll and the Illinois Subclass and Defendant are "persons" within the meaning of ICFA. 815 Ill. Comp. Stat. § 505/1(c).

265. The Contaminated Products are "merchandise." 815 Ill. Comp. Stat. § 505/1(b).

266. There was a sale of merchandise. 815 Ill. Comp. Stat. § 505/1(d).

267. The conduct described herein constitutes a violation of ICFA. 815 Illinois Compiled Statute §505/1, *et seq.*

268. Defendant engaged in a deceptive act or practice in violation of ICFA by knowingly misrepresenting, concealing, omitting, or failing to disclose the Contaminated Products' true quality, ingredients, standards, and suitability for use.

269. Defendant's deceptive acts and practices are continuing.

270. Defendant knew the Contaminated Products did not have the quality, or standards as described above because they contained heavy metals.

271. Defendant intended that Plaintiff Jaroll and the Illinois Subclass would rely on the overall impression of the packaging, along with the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated

CLASS ACTION COMPLAINT - 61

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Products' quality and standards when deciding to purchase the Contaminated Products, unaware of the undisclosed and misleading material facts.

272. Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct occurred before Plaintiff Jaroll and members of the Illinois Subclass decided to purchase the Contaminated Products.

273. Plaintiff Jaroll and the Illinois Subclass relied on, and were in fact deceived by, Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct with respect to the Contaminated Products' quality and standards.

274. The facts misrepresented, concealed, and/or not disclosed by Defendant were material facts in that Plaintiff Jaroll, the Illinois Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Jaroll and members of the Illinois Subclass known the Contaminated Products contained heavy metals, they would not have purchased the Contaminated Products or paid the premium price.

275. Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct as described herein repeatedly occurred in the course of Defendant's trade or commerce and were capable of deceiving a substantial portion of the consuming public.

276. Defendant's misrepresentations, partial misrepresentations, omissions and other deceptive acts or practices caused Plaintiff Jaroll and the Illinois Subclass to suffer injury in the form of actual damages when they purchased the Contaminated Products that were worth less than the price they paid and that they would not have purchased had they known the Contaminated Products contained heavy metals, including lead, cadmium, and arsenic.

277. As a direct and proximate result of Defendant's conduct, Plaintiff Jaroll and the Illinois Subclass suffered quantifiable economic injury to their business or property by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and/or arsenic; (2) purchasing Products they

CLASS ACTION COMPLAINT - 62

**HAGENS BERMAN**

would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented

278.    Plaintiff Jaroll is entitled to pursue a claim on behalf of the Illinois Subclass against Defendant for actual damages, punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs to remedy Defendant's violations of the ICFA pursuant to 815 ILCS 505/10a.

## COUNT VI

**Violations of Minnesota's Unlawful Trade Practices Act,**
**Minn. Stat. §325D.13,** *et seq.*
**(On behalf of Plaintiff Schmitt and the Minnesota Subclass)**

279.    Plaintiff Schmitt incorporates by reference all preceding paragraphs as though fully set forth herein.

280.    Defendant is a "person" within the meaning of the Minnesota Unlawful Trade Practices Act ("MUTPA").

281.    Defendant violated the MUTPA by knowingly misleading and deceiving Plaintiff Schmitt and the Minnesota Subclass through its Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the presence of heavy metals in the Contaminated Products.

282.    Defendant knew or should have known the Contaminated Products and their ingredients were not of the true quality advertised because they contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic.

283.    Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Schmitt and the Minnesota Subclass with respect to the Contaminated Products' true quality, ingredients, standards, and suitability for use.

CLASS ACTION COMPLAINT - 63

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

284. Defendant intended for Plaintiff Schmitt and the Minnesota Subclass to rely on its Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products' true quality, ingredients, standards, and suitability for use.

285. Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

286. Defendant was under a duty to disclose the Omissions because it actively concealed material information from consumers regarding the presence or risk of heavy metals in the Contaminated Products and undertook the disclosure of information about the Contaminated Products on the Contaminated Products' point-of-sale.

287. Defendant failed to discharge its duty to disclose the Omissions.

288. The facts misrepresented, partially misrepresented, actively concealed, omitted, or not disclosed by Defendant were material in that Plaintiff Schmitt, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Schmitt and the Minnesota Subclass known the Contaminated Products did not have the quality advertised by Defendant, they would not have purchased the Contaminated Products or paid the premium price.

289. Defendant charged, and Plaintiff Schmitt and the Minnesota Subclass Members purchased the Contaminated Products and paid, a premium for the Contaminated Products despite the availability of comparable, lesser-priced protein powdered products from other manufacturers.

290. Defendant's unlawful conduct is continuing with no indication that it intends to cease this fraudulent course of conduct.

291. As a direct and proximate result of Defendant's conduct, Plaintiff Schmitt and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for the Contaminated Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and arsenic; (2) purchasing the Contaminated Products they

CLASS ACTION COMPLAINT - 64

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented.

292. Plaintiff Schmitt and the members of the Minnesota Subclass would not have purchased the Contaminated Products at all had they known that Contaminated Products do not conform to the advertising or marketing contained on Defendant's point-of-sale.

293. Pursuant to Minnesota Statute sections 8.31, subdivision 3a, and 325D.15, Plaintiff Schmitt and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

COUNT VII

**Violations of Minnesota's Uniform Deceptive Trade Practices Act,
Minn. Stat. §325D.44, *et seq.*
(On behalf of Plaintiff Schmitt and the Minnesota Subclass)**

294. Plaintiff Schmitt incorporates by reference all preceding paragraphs as though fully set forth herein.

295. Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

296. Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by knowingly misleading and deceiving Plaintiff Schmitt and the Minnesota Subclass through its Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the presence of heavy metals in the Contaminated Products.

297. Defendant knew or should have known the Contaminated Products contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic.

298. Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Schmitt and the

CLASS ACTION COMPLAINT - 65

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Minnesota Subclass with respect to the Contaminated Products' quality, ingredients, standards, and suitability for use.

299. Defendant intended that Plaintiff Schmitt and the Minnesota Subclass would rely on its Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products' quality, ingredients, standards, and suitability for use.

300. Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

301. The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Schmitt, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Schmitt and the Minnesota Subclass known the Contaminated Products did not have the quality advertised by Defendant, they would not have purchased the Contaminated Products or paid a premium price.

302. Defendant charged, and Plaintiff Schmitt and the Minnesota Subclass Members purchased the Contaminated Products and paid, a premium price for the Contaminated Products despite the availability of comparable, lesser-priced powdered protein products from other manufacturers.

303. Defendant intended that Plaintiff Schmitt and the Minnesota Subclass would rely on its misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein when purchasing the Contaminated Products, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

304. Defendant's unlawful conduct is continuing, with no indication it intends to cease this fraudulent course of conduct.

305. Defendant was under a duty to disclose the Omissions because it actively concealed material information from consumers regarding the presence or risk of heavy metals in the

CLASS ACTION COMPLAINT - 66

011394-11/5037546 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Contaminated Products and undertook the disclosure of information about the Contaminated Products on the Contaminated Products' point-of-sale.

306. Defendant failed to discharge its duty to disclose the Omissions about the Contaminated Products.

307. As a direct and proximate result of Defendant's conduct, Plaintiff Schmitt and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for Contaminated Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and arsenic; (2) purchasing Contaminated Products they would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented.

308. Plaintiff Schmitt and the members of the Minnesota Subclass would not have purchased the Contaminated Products at all had they known the truth about the Contaminated Products' true quality, ingredients, standards, and suitability for use.

309. Pursuant to Minnesota Statute sections 8.31, subdivision 3a, and 325D.45, Plaintiff Schmitt and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUDTPA.

## COUNT VIII

**Violations of Minnesota's False Statement in Advertising Act,
Minn. Stat. §325F.67, *et seq*.
(On behalf of Plaintiff Schmitt and the Minnesota Subclass)**

310. Plaintiff Schmitt incorporates by reference all preceding paragraphs as though fully set forth herein.

311. Plaintiff Schmitt and the Minnesota Subclass purchased "goods," specifically the Contaminated Products discussed herein, and are a "person" within the meaning of the False Statement in Advertising Act ("FSAA").

CLASS ACTION COMPLAINT - 67

011394-11/5037546 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

312. Plaintiff Schmitt and the Minnesota Subclass purchased the Contaminated Products because of the misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct, asserted on the Contaminated Products' point-of-sale that were made, published, disseminated, circulated, and placed before the public by Defendant.

313. By engaging in the conduct as described herein, Defendant continues to violate Minnesota Statute section 325F.67.

314. Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive business practices described herein, include, by way of example, representations regarding the Contaminated Products' quality, ingredients, standards, and suitability for use.

315. Defendant knew or should have known the Contaminated Products did not have the quality, ingredients, standards, and suitability for use described above because they contained (or materially risked) undisclosed heavy metals, including lead, cadmium, and arsenic.

316. The Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct, were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Schmitt and the Minnesota Subclass with respect to the Contaminated Products' quality, ingredients, standards, and suitability for use.

317. Defendant's conduct, such as the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

318. The Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct, were made to customers in Minnesota, including Plaintiff Schmitt and the Minnesota Subclass, thus the cause of action serves the public benefit of informing Minnesota consumers that the Contaminated Products contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic.

CLASS ACTION COMPLAINT - 68

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

319. The facts concealed, omitted, or not disclosed by Defendant were material in that Plaintiff Schmitt, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Schmitt and the Minnesota Subclass known the Contaminated Products did not have the quality as advertised by Defendant, they would not have purchased the Contaminated Products or paid the premium price.

320. Defendant charged, and Plaintiff Schmitt and the Minnesota Subclass Members purchased the Contaminated Products and paid, a premium price for the Contaminated Products despite the availability of comparable, lesser-priced powdered protein products from other manufacturers.

321. Defendant intended that Plaintiff Schmitt and the Minnesota Subclass would rely on the deception by purchasing the Contaminated Products, unaware of the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other undisclosed material facts. This conduct constitutes consumer fraud.

322. Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

323. As a direct and proximate result of Defendant's conduct, Plaintiff Schmitt and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for the Contaminated Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and arsenic; (2) purchasing Contaminated Products they would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Contaminated Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented.

324. Plaintiff Schmitt and the members of the Minnesota Subclass would not have purchased the Contaminated Products at all had they known of the presence or material risk of heavy metals, including lead, cadmium, and arsenic.

CLASS ACTION COMPLAINT - 69

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

325. Pursuant to Minnesota Statute sections 8.31, subdivision 3a, and 325F.67, Plaintiff Schmitt and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the FSAA.

COUNT IX

**Violations of Minnesota's Prevention of Consumer Fraud Act,**
**Minn. Stat. §325F.69,** *et seq.*
**(On behalf of Plaintiff Schmitt and the Minnesota Subclass)**

326. Plaintiff Schmitt incorporates by reference all preceding paragraphs as though fully set forth herein.

327. Plaintiff Schmitt, at all times relevant hereto, was a citizen of the State of Minnesota.

328. Defendant is a "person" within the meaning of the Minnesota Prevention of Consumer Fraud Act ("MPCFA").

329. The misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein were made in connection with the sale of the Contaminated Products to Plaintiff Schmitt and the Minnesota Subclass.

330. Defendant knowingly acted, used, and employed fraud, false pretenses, and deceptive practices in connection with the sale of the Contaminated Products to Plaintiff Schmitt and the Minnesota Subclass. Specifically, Defendant failed to disclose the Contaminated Products contained levels or material risk of heavy metals, including lead, cadmium, and arsenic.

331. Defendant knew or should have known the Contaminated Products did not have the quality reasonable consumers expected because they included undisclosed (or the material risk of) significant levels of heavy metals, that do not conform to the Contaminated Products' point-of-sale. Defendant intended for Plaintiff Schmitt and the Minnesota Subclass to rely on the Contaminated Products' point-of-sale in deciding whether to purchase the Contaminated Products.

CLASS ACTION COMPLAINT - 70

011394-11/5037546 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

332. Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Contaminated Products' quality, ingredients, standards, and suitability for use, and, by extension, the true value of the Contaminated Products.

333. Plaintiff Schmitt and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein with respect to the Contaminated Products' quality, ingredients, standards, and suitability for use in deciding to purchase them over competitors' powdered protein products.

334. The facts concealed, omitted, or not disclosed by Defendant were material in that Plaintiff Schmitt, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Schmitt and the Minnesota Subclass known the Contaminated Products did not have the quality advertised by Defendant, they would not have purchased the Contaminated Products or paid the premium price.

335. Defendant charged, and Plaintiff Schmitt and the Minnesota Subclass Members purchased the Contaminated Products and paid, a premium price for the Contaminated Products despite the availability of comparable, lesser-priced powdered protein products from other manufacturers.

336. Defendant's misrepresentations and partial misrepresentations, including the Misrepresentations and Omissions, were made to customers in Minnesota, including Plaintiff Schmitt and the Minnesota Subclass, thus the cause of action serves the public benefit of informing Minnesota consumers that the Contaminated Products contained (or had a material risk of containing) significant levels of heavy metals, including lead, cadmium, and arsenic.

337. Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

338. As a direct and proximate result of Defendant's conduct, Plaintiff Schmitt and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for the Contaminated Products they reasonably believed did not contain (or have a material risk of containing) heavy

CLASS ACTION COMPLAINT - 71

011394-11/5037546 V1

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

metals, including lead, cadmium, and arsenic; (2) purchasing Contaminated Products they would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented.

339.    Plaintiff Schmitt and the members of the Minnesota Subclass would not have purchased the Contaminated Products at all had they known of the presence of heavy metals, including lead, cadmium, and arsenic.

340.    Pursuant to Minnesota Statute sections 8.31, subdivision 3a, and 325F.69, Plaintiff Schmitt and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

## COUNT X

**Violations of the Ohio Consumer Sales Practices Act,
Ohio Rev. Code Ann. §1345.01, *et seq*.
(On behalf of Plaintiff Baltzer and the Ohio Subclass)**

341.    Plaintiff Baltzer incorporates by reference all preceding paragraphs as though fully set forth herein.

342.    The Ohio Consumer Sales Practices Act ("Ohio CSPA") broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not." Ohio Rev. Code Ann. § 1345.02.

343.    Defendant is a "supplier" as that term is defined in the Ohio CSPA, as it sold and placed the Contaminated Products into trade which Plaintiff Baltzer and members of the Ohio Subclass purchased. Ohio Rev. Code Ann. § 1345.01(C).

344.    Plaintiff Baltzer and the Ohio Subclass Members purchased the Contaminated Products for personal, family, or household use and are therefore "consumers" as that term is defined in the Ohio CSPA. Ohio Rev. Code Ann. § 1345.01(D).

CLASS ACTION COMPLAINT - 72

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

345. The purchases of the Contaminated Products by Plaintiff Baltzer and the Ohio Subclass Members are "consumer transactions" within the meaning of the Ohio CSPA. Ohio Rev. Code Ann. § 1345.01(A).

346. Defendant's actions, as set forth above, occurred in the conduct of trade and commerce.

347. In the course of its business and consumer transactions, Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct described herein constituted unfair or deceptive acts or practices.

348. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with the intent that Plaintiff Baltzer and the Ohio Subclass Members rely upon such concealment, suppression or omission, in connection with the sale of the Contaminated Products.

349. It is an unfair or deceptive act or practice for Defendant to state that the Contaminated Products have "sponsorship, approval, performance characteristics, accessories, uses or benefits that [they] do not have." Ohio Rev. Code Ann. § 1345.02(B)(1).

350. It is also an unfair or deceptive act or practice for Defendant to represent that the Contaminated Products are "of a particular standard, quality, grade, [or] style[.]" Ohio Rev. Code Ann. § 1345.02(B)(2).

351. But for Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct, Plaintiff Baltzer and the Ohio Subclass Members would not have purchased Contaminated Products or would have paid substantially less for them.

352. Plaintiff Baltzer and the Ohio Subclass Members were uniformly exposed to Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct because Defendant marketed and advertised the Contaminated Products at the point-of-sale. These Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct are misleading and deceptive for the reasons described herein.

CLASS ACTION COMPLAINT - 73

011394-11/5037546 V1

353.    Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products are material to reasonable consumers, including Plaintiff Baltzer and the Ohio Subclass, for the reasons described herein and were designed to affect consumer decisions and conduct.

354.    Defendant understood and intended, or should have understood and intended, that the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct would influence consumer behavior. Defendant also understood that its failure to include the necessary explanatory information regarding these statements was material to consumers' decisions regarding what powdered protein product to purchase.

355.    Defendant also understands, or should have understood, it has an obligation to avoid misleading the public regarding the Contaminated Products.

356.    Because the information underlying the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct could not be found in a location to which consumers had reasonable access, consumers could not have reasonably avoided the losses caused by the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct forming the basis for the price of the Contaminated Products.

357.    Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct communicated at the point-of-sale constitute unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce for sales of the Contaminated Products to consumers.

358.    Defendant's acts and practices directly, foreseeably, and proximately caused Plaintiff Baltzer and the Ohio Subclass Members to suffer an injury-in-fact and/or actual damages, as described above. As a result, Plaintiff Baltzer and the Ohio Subclass Members suffered an ascertainable loss when they paid a premium for the Contaminated Products above and beyond what they should have paid, and provided Defendant more in revenues from the sale of the Contaminated Products than it should have received absent its false and misleading

CLASS ACTION COMPLAINT - 74

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

representations, Omissions, active concealment, and other deceptive conduct. Plaintiff Baltzer and the Ohio Subclass Members were also deprived of the benefit of their bargain since the Contaminated Products are worth less than they would have been absent Defendant's deceptive and unfair practices.

359. Defendant's acts and practices offend public policy as established by statute and case law.

360. Defendant's acts and practices are immoral, unethical, oppressive, and unscrupulous.

361. Defendant's conduct materially affected material information regarding its products to consumers nationwide and in each state where the Contaminated Products were sold. Defendant's conduct thus improperly distorted the information available to the public, including Plaintiff Baltzer and the Ohio Subclass, regarding the Contaminated Products.

362. The facts concealed or not disclosed or misrepresented by Defendant were material facts in that Plaintiff Baltzer and the Ohio Subclass, and other reasonable consumers, would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Baltzer and the Ohio Subclass Members known the Contaminated Products did not have the quality, ingredients, standards, and suitability for use as advertised by Defendant and contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic, they would not have purchased the Contaminated Products or paid a premium price.

363. Defendant's actions caused consumers, Plaintiff Baltzer, and the Ohio Subclass Members to overpay for the Contaminated Products. These injuries are not outweighed by any countervailing benefits, or any other legally cognizable benefit, to consumers or competition.

364. Defendant's conduct substantially injured actual and potential consumers, including Plaintiff Baltzer and the Ohio Subclass in connection with the sale of the Contaminated Products.

365. Plaintiff Baltzer specifically does not allege herein a claim for violation of Ohio Revised Code section 1345.72.

CLASS ACTION COMPLAINT - 75

011394-11/5037546 V1

366.    Defendant was on notice before the filing of this suit that its conduct in misleading consumers about the characteristics of the Contaminated Products was a violation of the Ohio CSPA because the actions taken by Defendant are "an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the [Ohio] Revised code before the consumer transaction on which [this] action is based." Ohio Rev. Code § 1345.09(B). Specifically, the Ohio Administrative Code § 109:2-4-02(A)(1) states:

> It is a deceptive act or practice in connection with a consumer transaction for a supplier, in the sale or offering for sale of goods or services, to make any offer in written or printed advertising or promotional literature without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions. Disclosure shall be easily legible to anyone reading the advertising or promotional literature and shall be sufficiently specific so as to leave no reasonable probability that the terms of the offer might be misunderstood.

367.    As a result of the foregoing wrongful conduct, Plaintiff Baltzer and the Ohio Subclass Members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendant's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.* Plaintiff also seeks punitive damages against Defendant because Defendant's conduct was egregious. Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct create a net impression to a reasonable consumer that the Contaminated Products are high quality, clean, and nutritious and do not contain or risk containing heavy metals, including lead, cadmium, and arsenic.

COUNT XI

**Violations of the Texas Deceptive Trade Practices and Consumer Protection Act,
Tex. Bus. & Com. Code §§17.41, *et seq.*
(On behalf of Plaintiff Hartwright and the Texas Subclass)**

368.    Plaintiff Hartwright incorporates by reference all preceding paragraphs as though fully set forth herein.

CLASS ACTION COMPLAINT - 76

011394-11/5037546 V1

369. Plaintiff Hartwright provided written notice to Defendant in accordance with Texas Business and Commerce Code section 17.505 by letter dated February 17, 2026 and July 2, 2026.

370. Defendant's misrepresentations, partial misrepresentations, omissions, concealment, and other deceptive conduct as described herein constitute a violation of the Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPCPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code §17.46.

371. Plaintiff Hartwright, the Texas Subclass, and Defendant are "persons" within the meaning of the TDTPCPA. Tex. Bus. & Com. Code §17.45(3).

372. Plaintiff Hartwright and the Texas Subclass are "consumers" within the meaning of the TDTPCPA. Tex. Bus. & Com. Code §17.45(4).

373. The Contaminated Products are "goods" within the meaning of the TDTPCPA. Tex. Bus. & Com. Code §17.45(1).

374. Defendant engaged in "trade" or "commerce" as defined by the TDTPCPA. Tex. Bus. & Com. Code §17.45(6).

375. Defendant engaged in false, misleading, or deceptive acts or practices, including by knowingly misrepresenting, concealing, omitting, or failing to disclose the Contaminated Products' true quality, ingredients, standards, and suitability for use.

376. Defendant's conduct alleged herein violates the following provisions of the CLRA:

(a) Texas Business and Commerce Code section 17.46(b)(5) by knowingly, recklessly, and/or intentionally representing that the Contaminated Products have characteristics, ingredients, benefits they do not have;

(b) Texas Business and Commerce Code section 17.46(b)(7) by knowingly, recklessly, and/or intentionally representing that the Contaminated Products were of a particular standard, quality, or grade, when they were of another;

CLASS ACTION COMPLAINT - 77

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(c)    Texas Business and Commerce Code section 17.46(b)(9) by knowingly, recklessly, and/or intentionally advertising the Contaminated Products with intent not to sell them as advertised; and

(d)    Texas Business and Commerce Code section 17.46(b)(24) by knowingly, recklessly, and/or intentionally failing to discuss material information regarding the Contaminated Products, which was known by Defendant at the time Plaintiff Hartwright and the Texas Subclass purchased the Contaminated Products, and for which they would not have purchased or paid the price they did for had the information been disclosed.

377.    Defendant knew the Contaminated Products did not have the quality, or standards as described above because they contained heavy metals, including lead, cadmium, and arsenic.

378.    Defendant intended that Plaintiff Hartwright and the Texas Subclass would rely on the overall impression of the packaging, along with the Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products' quality and standards when deciding to purchase the Contaminated Products, unaware of the undisclosed and misleading material facts.

379.    Plaintiff Hartwright and the Texas Subclass did rely on, and were in fact deceived by, Defendant's Misrepresentations, partial misrepresentations, Omissions, active concealment, and other deceptive conduct with respect to the Contaminated Products' quality and standards.

380.    Defendant failed to disclose the material information that the Contaminated Products contained (or had a material risk of containing) heavy metals.

381.    The facts misrepresented, concealed, and/or not disclosed by Defendant were material facts in that Plaintiff Hartwright, the Texas Subclass, and other reasonable consumers would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiff Hartwright and members of the Texas Subclass known the Contaminated Products contained heavy metals, they would not have purchased the Contaminated Products or paid the premium price.

CLASS ACTION COMPLAINT - 78

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

382. Defendant's false, misleading, or deceptive acts or practices occurred repeatedly in the course of Defendant's trade or commerce and were capable of deceiving a substantial portion of the consuming public.

383. Defendant's misrepresentations, partial misrepresentations, omissions and other deceptive acts or practices caused Plaintiff Hartwright and the Texas Subclass to suffer injury in the form of actual damages when they purchased the Contaminated Products that were worth less than the price they paid and that they would not have purchased had they known the Contaminated Products contained heavy metals, including lead, cadmium, and arsenic.

384. As a direct and proximate result of Defendant's conduct, Plaintiff Hartwright and the Texas Subclass suffered quantifiable economic injury to their business or property by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) heavy metals, including lead, cadmium, and/or arsenic; (2) purchasing Products they would not have purchased without Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct at the prices they paid; and/or (3) receiving Products that were worth less than the price paid because they contained heavy metals, rendering the Contaminated Products less valuable than represented.

385. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Hartwright's desire to purchase the Contaminated Products in the future if he can be assured that the Contaminated Products are as advertised and do not contain heavy metals.

386. Plaintiff Hartwright and the Texas Subclass seek relief for the injuries they suffered as a result of Defendant's false, misleading, or deceptive acts or practices, as provided by the TPTPCPA and applicable law.

CLASS ACTION COMPLAINT - 79

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

COUNT XII

**Fraudulent Concealment**
**(Based on Washington Law)**
**Against Defendant on Behalf of the Class**

387.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

388.    Plaintiffs bring this Count on behalf of all Class Members as a Nationwide class under Washington law.

389.    Defendant, as a seller of the Contaminated Products to Plaintiffs and the Class, had a duty to disclose to consumers that the Contaminated Products contained heavy metals, including lead, cadmium, and arsenic.

390.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs and the Class, and other reasonable consumers, would have considered them in deciding whether to purchase the Contaminated Products. Had Plaintiffs and the Class Members known the Contaminated Products did not have the quality, ingredients, standards, and suitability for use as advertised by Costco and contained (or had a material risk of containing) heavy metals, including lead, cadmium, and arsenic, they would not have purchased the Contaminated Products or paid a premium price.

391.    Defendant alone possessed the information that was material to Plaintiffs and the Class and failed to disclose such material information to consumers.

392.    Because identifying the presence of heavy metals requires expensive and sophisticated laboratory testing, reasonable consumers, such as Plaintiffs, could not learn of the inclusion of heavy metals in the Contaminated Products unless Defendant included a proper disclosure.

393.    Defendant misrepresented, partially misrepresented, omitted, suppressed, and concealed material facts regarding the Contaminated Products, namely the fact that the Contaminated Products contained heavy metals, including lead, cadmium, and arsenic.

CLASS ACTION COMPLAINT - 80

011394-11/5037546 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

394.    As a result of Defendant's Misrepresentations and partial misrepresentations, with no disclosures as to the presence or risk of heavy metals in the Contaminated Products on at the point-of-sale, Plaintiffs did not expect the Contaminated Products to contain heavy metals.

395.    Defendant intended for Plaintiffs and the Class to rely on its Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct regarding the Contaminated Products' quality, ingredients, standards, and suitability for use when purchasing the Contaminated Products, unaware of the undisclosed material facts.

396.    Plaintiffs and the Class Members did in fact rely on the material Misrepresentations, partial misrepresentations, and Omissions and purchased the Contaminated Products to their detriment. Given the materiality of the Omissions, Plaintiffs' and the Class's reliance on the Misrepresentations, partial misrepresentations, and Omissions were justifiable.

397.    Plaintiffs and the Class Members purchased the Contaminated Products that contain undisclosed levels of heavy metals despite the availability of other protein powder products with non-detectable levels of heavy metals.

398.    Defendant charged, and Plaintiffs and the Class Members paid, a premium price for the Contaminated Products despite the availability of other protein powder products with non-detectable levels of heavy metals.

399.    Defendant's Misrepresentations and partial misrepresentations, Omissions, active concealment, and other deceptive conduct alleged herein caused Plaintiffs and the Class Members to make their purchases of the Contaminated Products. Plaintiffs were unaware of these material facts, and had Defendant communicated these material facts to consumers, Plaintiffs and the Class Members would not have purchased the Contaminated Products, or would not have purchased the Contaminated Products at the prices they paid. Accordingly, Plaintiffs and the Class Members have suffered injury in fact, including lost money or property, as a result of Defendant's Misrepresentations, partial misrepresentations, Omissions, and other deceptive conduct.

CLASS ACTION COMPLAINT - 81

011394-11/5037546 V1

400. Accordingly, Defendant is liable to Plaintiffs and the Class Members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

401. Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class Members' rights, in order to enrich itself. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully request that this Court enter judgment against Defendant and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B. Enter judgment against Defendant Costco Wholesale Corporation on Plaintiffs' claims for violation of the laws of Washington, California, Illinois, Minnesota, Ohio, and Texas, and judgment under the law of fraudulent concealment;

C. Award Plaintiffs and all Class Members their actual damages and judgment under the law of fraudulent concealment;

D. Award treble damages up to the maximum amount permitted under RCW § 19.86.090;

E. Award Plaintiffs and the Classes reasonable attorneys' fees and costs of suit pursuant to RCW §19.86.090;

F. Enter injunctive relief requiring Defendant to: (i) disclose the presence and levels of heavy metals, including lead, cadmium, and arsenic, in the Contaminated Products sold in its stores and on Costco.com; and (ii) cease selling such products without adequate disclosure of heavy metal contamination;

CLASS ACTION COMPLAINT - 82



**HAGENS BERMAN**

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

G.    Award pre-judgment and post-judgment interest at the maximum rate permitted by law; and

H.    Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

DATED: July 7, 2026                    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman, WSBA No. 12536
*/s/ Shelby Smith*
Shelby Smith, WSBA No. 31377
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
shelby@hbsslaw.com

Rebecca A. Peterson (*pro hac vice* forthcoming)
Krista K. Freier
Catherine A. Peterson
**HECHT PARTNERS LLP**
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612) 778-9595
rpeterson@hechtpartners.com
kfreier@hechtpartners.com
cpeterson@hechtpartners.com

*Attorney for Plaintiffs*

CLASS ACTION COMPLAINT - 83

011394-11/5037546 V1